UNITED STATES of America,
Plaintiff-Appellee,

v.

George L. KELLY, Thomas Francis Kelly, Sr., Thomas Francis Kelly, Jr. and Louis Efkeman, Defendants-Appellants.

No. 15209.

United States Court of Appeals
Sixth Circuit.

Feb. 26, 1964.

Walter E. Gallagher, Washington, D. C., for appellants, J. Leonard Walker, Louisville, Ky., on the brief.

William E. Scent, U. S. Atty., Louisville, Ky., and Edward J. Joyce, Dept. of Justice, Washington, D. C., for appellee, Wayne J. Carroll, Asst. U. S. Atty., Louisville, Ky., on the brief.

Before WEICK, Chief Judge, PHILLIPS, Circuit Judge, and FREEMAN, District Judge.

WEICK, Chief Judge.

Appellants were convicted by a jury in the District Court on four counts of a 12-count indictment charging them with knowingly sending in interstate commerce paraphernalia, paper and writing used and to be used and adapted, devised and designed for use in bookmaking in violation of Title 18 U.S.C. § 1953 and Title 18 U.S.C. § 2. They were sentenced to pay fines and costs.

Section 1953 of Title 18 was a new criminal statute enacted by Congress in 1961. It was sponsored by the Attorney General, along with six other bills, in his program to curb organized crime and

racketeering. The portion of the statute pertinent in this case is as follows:

"§ 1953. Interstate transportation of wagering paraphernalia

"(a) Whoever, except a common carrier in the usual course of its business, knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in (a) bookmaking; or (b) wagering pools with the respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game shall be fined not more than $10,-000 or imprisoned for not more than five years or both.

"(b) This section shall not apply to * * * (3) the carriage or transportation in interstate or foreign commerce of any newspaper or similar publication. * *

Title 18 U.S.C. § 2 is the aider and abettor statute.

Count 1 of the indictment charged the appellants and Kentucky News Company, Inc., a corporation, with conspiracy in violation of Title 18 U.S.C. § 371. Paul Reeder Jacobs was named as a co-conspirator, but not a defendant. Counts 2 and 3 charged appellants with the substantive offenses of sending, on two different days, skids of paper from Chicago, Illinois to Louisville, Kentucky which were used for the production of a racing finger sheet known as the Louisville Daily Sports News; Counts 4 and 5 charged appellants with sending from Chicago to Louisville, on different days, copies of the Overnight Edition of the Illinois Sports News also used in the production of the alleged finger sheet. Counts 6, 7, 8, 9, 10, 11 and 12 charged appellants and Kentucky News Company, Inc. with sending on various dates the finished product, Louisville Daily Sports News,

from Louisville to Jeffersonville, Indiana.

At the close of the evidence, the District Judge granted a motion for judgment of acquittal made by the corporate defendant Kentucky News Company, Inc. and it was dismissed from the case.

The case as to the remaining defendants was submitted to the jury. The jury returned verdicts of not guilty on Count 1 which charged conspiracy and not guilty on Counts 6 to 12 inclusive which alleged the sending of the finished sheet, namely, the Louisville Daily Sports News from Louisville, Kentucky to Jeffersonville, Indiana.

The verdicts of guilty were with respect to Counts 2 and 3 which charged sending in interstate commerce of the skids of paper and 4 and 5 which charged sending in interstate commerce of Illinois Sports News both of which were used in the composing and printing of Louisville Daily Sports News.

The Kellys resided in Illinois. They were a partnership. They owned Illinois Sports News which was acquired in 1946 and has been published in Chicago for many years. They have owned and published Louisville Daily Sports News [1] since 1948. Appellant Louis Efkeman was resident manager of LDSN for about ten years.

Kentucky News Company, Inc., was a Kentucky corporation engaged as a wholesale distributor of newspapers, magazines, paperback books, etc. It made deliveries of LDSN and a publication called Daily Racing Form to newsstands in Louisville where they were sold to the public. It also distributed Illinois Sports News to some newsstands in Louisville.

The skids of paper mentioned in Counts 2 and 3 of the indictment were blank sheets of white paper with the masthead Louisville Daily Sports News imprinted thereon. The blank sheets were used by appellants in Louisville for printing the publication LDSN which

---

1. Louisville Daily Sports News will be referred to as LDSN.

was made up of (1) material copied from the Overnight Edition of Illinois Sports News sent there from Chicago each night by air-mail, rail and bus and (2) early morning information as to scratches,[2] weather conditions at tracks and names of jockeys obtained by its reporters at race tracks and sent to Louisville from Chicago over a private teletype circuit.

LDSN was printed on both sides of a single sheet of heavy white paper about 12½″ x 19″. The front side was filled in mostly by undated news of sporting events principally relating to horses and horse racing. The back side listed the days racing entries at four or five major race tracks, the names of the jockeys, the weight each horse will carry, track conditions, post time for each race, distance of each race, the class and value, late scratches, "picks" for each race that will appear in official programs published by the respective tracks and the finger[3] "picks" selected by employees of appellants, and probable odds. The front side contained an alphabetical index of the horses that were scheduled to race, the name of the track, the number of the races along with the number of starts, firsts, seconds and thirds for the past twelve months or more. It also listed the "Trackman's Overnight Selections" for some of the tracks and contained some of the previous day's racing results, together with the mutuel prices and scratches. Where a particular issue covered five tracks there was little or no room for filling in news items of other sporting events.

LDSN was distributed by Kentucky News Company and three of the employees of LDSN, in their spare time, acting as independent distributors. The Government offered proof tending to show that, during a portion of the period covered by the indictment, Kentucky News Company accounted for about 45% of the total distribution and the three employees 55%. This was without allowance for returns and without consid-ering distribution by another employee named Schneider. Many of the issues were purchased by bookmakers and were given by them to their customers who were bettors. Subsequent to the indictment, the entire distribution of LDSN was handled by Kentucky News Company.

It was the claim of the Government that the skids of blank white paper with the LDSN masthead, the Illinois Sports News and the finished publication Louisville Daily Sports News were paraphernalia, paper, and writing used and designed for use in bookmaking and hence came within the proscription of Section 1953 which made unlawful their interstate transportation.

The appellants' first contention was that their publication LDSN and the component parts used in assembling it were not paraphernalia, paper, or writing used or designed for use in bookmaking. They did not deny that their publication, like the sports pages of many newspapers of general circulation, was extremely valuable to persons who bet on horse races or even bookmakers, but contended it was not any implement of the bookmaking operation such as the bookmaker's record book, or as numbers slips, punch boards, roulette wheels or other gambling apparatus or devices would relate to other types of gambling operations.

Appellants' second defense was that their publication was expressly exempted from the operation of the statute by the language which excludes "any newspaper or similar publication." Appellants contend that if the statute is construed to prohibit their publication, it is unconstitutional in violation of the Fifth and Sixth Amendments to the Constitution of the United States.

Appellants made motions for judgments of acquittal at the close of the Government's case and renewed them at the close of all the evidence. The motions were denied by the court. These rulings

---

2. Horses withdrawn the morning of the race.

3. In the entries a finger is pointed at the horse picked to win.

by the court are the principal grounds of this appeal.

There was no evidence that appellants were engaged in bookmaking or in the business of receiving or accepting bets or wagers. The Government admitted that appellants' operations did not violate state law. It has been held that the transmission by teletype of the early morning news of scratches, jockeys and weather conditions at the track did not violate federal or state law.

In the recent case of Thomas F. Kelly, Sr. etc. et al. v. Illinois Bell Telephone Co., et al., 325 F.2d 148 (CA 7, 1963), the Court of Appeals held that the activities of the appellants in receiving and transmitting gambling information to be published in publications sold and distributed to the general public through newsstands, agency news distributors, inside race track enclosures and to individual subscribers did not violate 18 U.S.C. § 1084, 18 U.S.C. §§ 1952 or 1953 or any law of the state of Illinois. In that case, the Government cited the conviction in the case at bar as authority for the proposition that appellants violated

18 U.S.C. § 1953. The Court of Appeals, however, as well as the District Court, regarded the convictions and acquittals in the present case as being "equally susceptible of diametrically opposed inferences with respect to the basic issue here," namely, whether in that case the wire facilities were used for transmitting or receiving gambling information in violation of Federal, State or local law.

It would seem rather incongruous to permit the receipt and transmission of racing information by telephone and teletype and prohibit the transportation of a finished publication or the materials of which it was composed which carried substantially the same information.

The legislative history of Section 1953, and its companion Section 1084,[4] which were considered at the same time by the Senate and House Judiciary Committees and passed on the same day, indicated that Congress was fully aware of the broad and all inclusive provisions of both bills as originally offered and of the publication of racing results or predictions carried in the sports sections in many newspapers of general circulation in met-

---

4. "§ 1084. Transmission of wagering information; penalties

"(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

"(b) Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State where betting on that sporting event or contest is legal into a State in which such betting is legal.

"(c) Nothing contained in this section shall create immunity from criminal prosecution under any laws of any State,

Commonwealth of Puerto Rico, territory, possession, or the District of Columbia.

"(d) When any common carrier, subject to the jurisdiction of the Federal Communications Commission, is notified in writing by a Federal, State, or local law enforcement agency, acting within its jurisdiction, that any facility furnished by it is being used or will be used for the purpose of transmitting or receiving gambling information in interstate or foreign commerce in violation of Federal, State or local law, it shall discontinue or refuse, the leasing, furnishing, or maintaining of such facility, after reasonable notice to the subscriber, but no damages, penalty or forfeiture, civil or criminal, shall be found against any common carrier for any act done in compliance with any notice received from a law enforcement agency. Nothing in this section shall be deemed to prejudice the right of any person affected thereby to secure an appropriate determination, as otherwise provided by law, in a Federal court or in a State or local tribunal or agency, that such facility should not be discontinued or removed, or should be restored.

ropolitan areas, in newspapers devoted principally to racing such as the Morning Telegraph, the Daily Racing Form and in scratch sheets such as LDSN, Illinois Sports News and The Armstrong Daily News Review. Both bills originally contained no exemption (1) in favor of news reporting of sporting events or contests or (2) the carriage or transportation in interstate commerce of any newspaper or similar publication. The bills were later amended so that Section 1084 contains (1) and Section 1953 exempts (2). Both statutes contain other exemptions.

The Senate Judiciary Committee, in considering Section 1953, reported:

"The committee also felt that the bill, as introduced, might be so interpreted as to bring within its criminal penalties a person who carried a newspaper or other publication containing racing results or predictions. In order clearly to prevent such an interpretation the committee has excluded the carrying or transporting into interstate or foreign commerce of any newspaper or similar publication from the provisions of the bill." [Sen.Rept.No. 589, 87th Cong., 1st Sess. p. 2]. U. S.Code Congressional and Administrative News, 1961, p. 2634.

Senator Eastland, Chairman of the Senate Judiciary Committee, stated:

"Also, to avoid any possibility of an interpretation which might bring within the criminal penalties of the bill a person who carries a newspaper or similar publication containing racing results or predictions, a specific exception is provided." [Congressional Record, July 28, 1961, p. 12900]

The House Judiciary Committee reported:

"Finally, a third exemption is provided for the carriage or transportation in interstate or foreign commerce of any newspaper or similar publication.

"This is primarily designed to exclude from the scope of the bill the carrying of a newspaper or other publication containing racing results or predictions when such transportation is in interstate or foreign commerce." [H.R.Rept. 968, 87th Cong., 1st Sess., p. 3]

Congressman Celler, Chairman of the House Judiciary Committee stated:

"The primary purpose is to prevent the transportation in interstate commerce of wagering material. The purpose actually is to cutoff and shutoff gambling supplies, in reality to prevent these lotteries and kindred illegal diversions." [Cong.Rec. Aug. 21, 1961, p. 15450]

"The bill has no application to newspapers or publications that are sent from one State to another carrying information concerning gambling, and it does not refer to the transfer of this wagering paraphernalia into a State where such gambling is legal." [Id., p. 15451]

In hearings before the Senate Judiciary Committee, Assistant Attorney General Miller, referring to tout sheets stated:

"Mr. Miller: I do not believe they would be covered by this bill, sir.

"Senator Keating: Do you think they might be?

"Mr. Miller: The problem of attempting to cover the so-called tout sheets, then we would get into the problem that you raise because many of the newspapers, of course, carry, in effect, selections, daily selections for the day's races, and I believe there is one in the Daily News where you have a man called Paddock who picks winners in the various races that are being run throughout the country, and, in effect, a tout sheet is basically nothing more than that, with due apologies to Mr. Paddock." [Hearings before the Committee on the Judiciary, U. S. Senate, 87th Cong., 1st Sess., June 21, 1961, p. 296]

In referring to the New York Times and Wall Street Journal Mr. Miller stated:

"All right, sir, we will take both of them. Let us accept both of those newspapers. The paper, itself, is not used or designed for use in bookmaking, wagering pools, with respect to a sporting event, or in a numbers game.

"Now when we are talking about bills, slips, tokens, and so forth, we are talking about the actual implements. For example, in a numbers game, it is the numbers slips that actually have the numbers written on them, the amount of the bet and the like. This is a part of it.

"Another example would be the records of the bookmaker who totals his bets on the horse and the like. Or if we want to go into sweepstake tickets, which is an obvious example, because that relates to wagering pools with respect to a sporting event.

"Now the newspapers involved are not used or designed to be used in any of these three prohibited types of gambling, and, consequently, I feel very strongly that it would not be included within the purview of this bill." [Id., p. 289]

During a colloquy, Mr. Miller further stated:

"Senator Keating: Now let me take you to this point. How about the Morning Telegraph which is devoted entirely to racing forms and that type of operation? Is that supposed to be covered under this bill?

"Mr. Miller: No, sir.

"Senator Keating: That certainly is often used and perhaps designed for use in some of these particular operations. You are going to deal with the Morning Telegraph?

"Mr. Miller: Yes, sir; you have a dual concept. The newspaper to which you refer—I am not familiar with it, but let us assume it is devoted to horse racing.

\*   \*   \*   \*   \*   \*

"Mr. Miller: The newspaper would have information concerning horse racing generally.

"Now that is the information which is concerned, horse racing, but it is not utilized in a horse racing event in the same nature as would perhaps a ticket which would be purchased from a parimutuel machine. Or let us assume, further, that this newspaper carried a substantial amount of space devoted to the numbers game where you know what the number is, and similar information.

"It would be information related to it, but would not be actually a part of the numbers operation. It would not be used as a part of the numbers operation. For example, some of these bookmakers now utilize, to a great extent, what is called flash paper." [Id., pp. 289–290]

Attorney General Kennedy testified before the House Judiciary Committee in respect to the companion bill which became Section 1084 as follows:

"The Chairman: Let us go to H.R. 7039, which concerns the transmission of bets, wagers, and gambling information.

"Mr. Kennedy: Which one?

"The Chairman: H.R. 7039. There you exempt newspapers and information on wagers and racetrack information that may be conveyed by news reporting and other media of communication. I refer to page 2, line 14: 'Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests.'

"I take it that would not prevent papers like the Morning Telegraph or the Armstrong publications from publishing the latest trackside information. Let us take this case.

This is just for the purpose of bringing out and clarifying what this all means.

"Let's say the Preakness is running this coming Saturday. On Saturday morning, the day of the race, early in the morning, a jockey is injured. He is riding a certain horse in that race. Another jockey is substituted. That is valuable information to the bookmakers.

"If that information is conveyed, say, by telephone, telautograph, or Western Union, that might very well violate the statute. But if the 11 o'clock edition of the Washington Post contained that same information which is of value to bookmakers, it would be no violation.

"Mr. Kennedy: That's right.

"The Chairman: How do you reconcile that?

"Mr. Kennedy: Again I don't think you can have a perfect law. As I said in my statement, the great problem for those involved in this business is instantaneous information. They cannot rely on the fact that this information is going to appear in time in the Washington Post. They are going to, and have, set up other facilities in order to obtain information." [Hearings before Subcommittee No. 5, Committee on the Judiciary, House of Representatives, 87th Cong., 1st Sess., May 17, 1961, p. 37]

If it was desired to deal with the transmission of rapid or instantaneous information then the suggestion of the Senate Committee on Government Operations could be adopted. It reported on March 28, 1962, after the passage of Sections 1953 and 1084, as follows:

"The subcommittee recommends that, among other measures, Congress consider Federal legislation which would prohibit the dissemination of horserace results and related information from race-tracks for 1 hour before each race begins and for 1 hour after the completion of each race.

"Because the professional bookmaker depends on fast results for big-volume business, the subcommittee is convinced that legislation so restricting the time within which horserace results may be disseminated from the track would have a most salutary effect." [Sen.Rept.No.1310, 87th Cong., 2d Sess., p. 47]

The report further stated:

"It is clear that Armstrong Daily aids and abets bookmaking operations as does almost every newspaper in the United States that carries horse race information in its sports section. There can be no doubt that its service is used almost exclusively by bookmakers and bettors for both on and off track bookmaking. [Id., p. 17]

"One race information and tip service that operates openly, and under current law is recognized as a legitimate enterprize, is the Armstrong Daily, which is owned by the Annenberg family and the M. L. Annenberg Foundation. * * *" [Id., p. 16]

At the trial appellants offered expert testimony of newsmen who gave their opinions that LDSN was a newspaper or similar publication. The Government, in rebuttal, called other newsmen who gave opinions diametrically opposed to appellants' witnesses and testified that LDSN was not a newspaper or similar publication.

Congress did not define the words "any newspaper or similar publication." Appellants contend that a newspaper is merely a paper that contains news. They assert that Section 1953 contained no limitation on the kind or type of newspaper which qualified for the exemption, but used the word "any," which they claim, is broad enough to cover a publication devoted to racing results or predictions. They argue that the words "or similar publication" indicate that some-

thing less than a regular newspaper was intended.

There is a conflict in the authorities as to what constitutes a newspaper. Textwriters indicate that there are so many varieties of newspapers that it has been found unsatisfactory to give any definition except a very general one. 39 Am. Jur., Newspapers & Press Associations, §§ 2 & 9, pp. 3, 4 & 7; 66 C.J.S. Newspapers § 1, pp. 22–23.

In Re Sterling Cleaners & Dyers, 81 F.2d 596 (CA 7), the court held that the Chicago Daily Law Bulletin was a newspaper within the provisions of Section 28 of the Bankruptcy Act of 1898. The Bulletin was published daily in sheet form and was devoted principally to publishing news and notices of proceedings in Chicago courts. In defining newspaper the court said:

"Various definitions have been given by the courts of the term 'newspaper' in connection with the construction of statutes requiring publication of various kinds of legal notices, but when the term has been used without qualifying language it is pretty generally agreed that it means a medium for the dissemination of news of passing events printed and distributed at short but regular intervals."

Publications similar to those of the appellants have been held to be newspapers. Armstrong Daily, Inc. v. Overstreet, No. 175111-A, Circuit Court, 11th Judicial Circuit, Dade County, Florida, affirmed Fla.App., 133 So.2d 792. The Circuit Court relied on Armstrong Racing Publications v. Moss, 181 Misc. 966, 43 N.Y.S.2d 171; Pennsylvania Publications, Inc. v. Pennsylvania Public Utility Commission, 349 Pa. 184, 36 A.2d 777, 153 A.L.R. 457 and other authorities.

Before charging the jury in the present case the court informed counsel as to his intentions as follows:

"I am going to tell this jury that they are to give the meaning to the word newspaper and to that entire phrase, any newspaper or similar publication, that is conveyed by the words, themselves, taking them in their ordinary and common usage. It is my thought that as a guide, merely as an offer of assistant (sic), I will read the Webster's Dictionary's definition of newspaper, but leaving it to the judgment of the jury, as to what a newspaper is.

"Mr. Gallagher: And similar publication.

"By the Court: And what is a similar publication. And it is their ultimate and uncontrolled decision, except based upon the evidence they have heard and help they may have received from experts who have testified."

In instructing the jury on this subject the District Court said:

"And in deciding this question you are directed that the words 'any newspaper or similar publication' as used in this statute are used in their ordinary sense and are to be given the meaning commonly attributed to them.

"One definition of 'newspaper' which you may consider but need not accept and which is given to you merely as a guide is found in Webster's New International Dictionary, Second Edition. There a newspaper is defined as: 'A paper printed and distributed at stated intervals, usually daily or weekly, to convey news, advocate opinions, and so forth; now usually containing also advertisements and other matters of public interest; also an organization engaged in composing and issuing such a publication.'

"In final analysis, however, apart from this definition, you must decide whether in considering all of the evidence as to such things as format, content, manner of publication and the use to which they can be—could be put, such paraphernalia, papers and writings as you believe were sent in interstate commerce and which you also believe were used, to

be used, or devised, designed or adapted for use in bookmaking, constituted any newspaper or similar publication within the usual and accepted meaning of those words."

After the jury had deliberated about five hours the following took place:

"Foreman Hill: Well, some of the jurors would like to know whether similar publication means a similar newspaper or similar publication, or a publication and a newspaper is synonomous [sic] whether or not they are used as that.

"By the Court: Of course, under the instructions that have been given, the jury is to apply the commonly accepted definition to the words, any newspaper or similar publication, and it is for the jury to say.

"Foreman Hill: Well, in the law does the word newspaper—isn't that repetitive and redundancy, if they say, or similar publication—if publication means the same thing as a newspaper? Are we to interpret that the similar publication means the same thing as a newspaper, or is that two classifications of publications. A newspaper is one publication and a similar publication has a slightly different significance?

"By the Court: Well, I think it is rather obvious that Congress wanted to say any newspaper, they would stop there, unless significance was to be given to 'or similar publication.'

"Foreman Hill: Other types of publication, or similar type of publication. I think that answers that question."

The next morning appellants' counsel made a request for further instructions. The jury addressed written questions to the court. The record discloses the following:

"By the Court: Members of the Jury, at the time of recess yesterday evening, two questions were presented to the Court.

"The first one reads: 'What did you mean by "ordinary sense" and "commonly attributed" to them?,' as these words were used on page 10, line 14 and 15 of the instructions.

"And then a somewhat similar question, which reads: 'On page 11, line 8, interpret—"usual and accepted meaning of those words?"'

"Now, page 10, line 14 and 15 reads as follows: 'You must then further determine whether such paraphernalia, papers and writings were within the statutory exemption for [and I quote] "any newspaper or similar publication", and in deciding this question you are directed that the words "any newspaper or similar publication" as used in this statute are used in their ordinary sense and are to be given the meaning commonly attributed to them.'

"I think the second question is practically a repetition of the first one.

"I hardly know how to interpret what is meant by 'taking words in their ordinary sense' and giving to them the interpretation that is commonly attributed to them.

"We have all used the word 'newspaper' many, many times, and that is one word in this phrase, 'any newspaper or similar publication.'

"I gave you as a guide the Webster's Dictionary definition of a newspaper. That is contained in the instructions. If you think it would be helpful, I will give you the dictionary definition of the word 'similar' and the word 'publication', again to be used as a guide by you.

"The word 'similar' is defined in Webster as meaning 'Nearly, corresponding, resembling in many respects, somewhat like, having a general likeness.'

"The word 'publication' is defined in Webster's Dictionary as '1. Act of publishing, or state of being published, public notification. 2. The issuing to the public of copies of a book, engraving, or the like; hence, the business of printing, etc. such

copies. 3. That which is published, especially any book, pamphlet, etc., offered for sale or to public notice.'

"As I stated, members of the Jury, when we say that words are to be given their natural, popular and approved meaning, the meaning they are given as they are used in common everyday usage, you have about said it.

"This is a question the jury must decide, and many questions are presented to juries, and in considering and weighing the evidence, the jury must bring into play their own personal knowledge and information they have gathered from their experience, and use their good, common sense in deciding these issues that are presented to them.

"I have gone over the instructions again. I feel that they do set forth the law of this case, and if you will apply the law as given to you in these instructions, the facts as you find them to be,—and that is your job as a jury to decide the facts and then apply the law to them, so you can reach a verdict. I am sure you are willing to try."

It will be noted that although the court did give Webster's definition of newspaper to the jury as a guide, he told them that they need not accept that definition. This left the jury free to adopt its own ideas or definition as to what constituted a newspaper.

■ In our opinion, it was exclusively the function of the court to construe and define the words "any newspaper or similar publication" and of the jury to determine whether the facts were sufficient to bring appellants' publication within the ambit of the definition. United States v. American Trucking Associations, Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

If the court's definition was not binding on the jury then the jury had the right to adopt its own definition. Different juries might disagree on the definition with the result that an accused would have no standard by which he could determine whether his publication came within the scope of the statute's exemption.

■ While a dictionary definition might suffice in some cases, we are concerned here with a definition which will give effect to the Congressional intent. In order to ascertain that intent, resort must be had to the legislative history, even though the language of the statute appears to be plain. Harrison v. Northern Trust Co., 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407; Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211; People of Puerto Rico v. The Shell Co., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235.

■ Without a definition binding on the jury, the words would be too indefinite and vague and subject to different interpretations. It is settled that a criminal statute must be definite in order to conform to constitutional standards. Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840; Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516.

■■ We think the legislative history of Section 1953 and its companion Section 1084 clearly indicates that Congress did not intend to inhibit publications containing racing results or predictions. If this information may lawfully be included in the sports sections of large daily metropolitan newspapers there is no valid reason why appellants cannot print and circulate the same news. The court was requested to charge the jury that a newspaper or similar publication could be one devoted to racing results or predictions. Such an instruction would be tantamount to directing a verdict for the appellants because LDSN was devoted to racing news or predictions. The other sports news it carried was incidental and included merely to fill in gaps in the sheet.

Consideration of the legislative history of Section 1953 persuades us that LDSN comes within the ambit of "any news-

paper or similar publication" and was, therefore, exempt from the operation of the statute.

It follows that the motions for a directed verdict of acquittal should have been granted. The judgments of the District Court are reversed and the cases remanded with instructions to discharge the appellants.