UNITED STATES of America,
Plaintiff,

v.

Raymond Joseph AZAR, Peter Joseph
LOCRICCHIO, Defendants.

Civ. A. No. 39471.

United States District Court
E. D. Michigan, S. D.

Aug. 6, 1964.

Paul Komives, Asst. U. S. Atty., Detroit, Mich., for the United States.

Edward A. Khoury, Detroit, Mich., Edward T. Kelley, Grosse Pointe, Mich., for defendants.

TALBOT SMITH, District Judge.

This is a legal test of two recently-enacted anti-racketeering statutes.[1] The facts are largely stipulated. What we have before us is a tip sheet (called a Greensheet, Exhibit 1) employed in the numbers racket to guide the players to successful choices of numbers. The ac-

1. T. 18, § 1952; T. 18, § 1953 (set out in full infra).

tivities of the defendants in connection with the printing (in Ohio) and the distribution (in Michigan) thereof bring them before us.

Both defendants are named in each count of an 18 count indictment. Counts 1, 4, 7, 10, 13 and 16 charge that on certain specified dates the defendants knowingly carried and sent the Greensheets in interstate commerce, allegedly in violation of 18 U.S.C. § 1953.[2] Counts 2, 5, 8, 11, 14, and 17, (also allegedly in violation of 18 U.S.C. § 1953) charge that the defendants travelled in interstate commerce with intent to promote, manage, carry on, and facilitate the promotion, management and carrying on, of an unlawful activity, namely a so-called "numbers" operation, and that defendants thereafter performed certain acts to promote, manage, carry on, and facilitate the promotion, management and carrying on, of that unlawful activity.

Counts 3, 6, 9, 12, 15 and 18 are substantially identical to counts 2, et seq., except that they charge defendants with having used certain facilities in interstate commerce, rather than with having travelled in interstate commerce. Counts 2, et seq, and 3, et seq, are alleged to be violations of 18 U.S.C. § 1952.[3]

We will first consider whether or not the Greensheet comes within the ambit of Section 1953, forbidding the interstate transportation of wagering paraphernalia, said section providing, however, its non-applicability to certain equipment and publications, as hereinafter considered in detail.

This Greensheet (Ex. 1) consists of undated sports news, recipes, winning number predictions, and other items. On the first page are two undated sports items, taking up most of the page. At the bottom thereof are various selections of numbers with corresponding dates, to-

---

2. § 1953. Interstate transportation of wagering paraphernalia

(a) Whoever, except a common carrier in the usual course of its business, knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game shall be fined not more than $10,000 or imprisoned for not more than five years or both.

(b) This section shall not apply to (1) parimutuel betting equipment, parimutuel tickets where legally acquired, or parimutuel materials used or designed for use at racetracks or other sporting events in connection with which betting is legal under applicable State law, or (2) the transporation of betting materials to be used in the placing of bets or wagers on a sporting event into a State in which such betting is legal under the statutes of that State, or (3) the carriage or transportation in interstate or foreign commerce of any newspaper or similar publication.

(c) Nothing contained in this section shall create immunity from criminal prosecution under any laws of any State, Commonwealth of Puerto Rico, territory, possession, or the District of Columbia.

3. § 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises.

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion or bribery in violation of the laws of the State in which committed or of the United States.

(c) Investigations of violations under this section involving liquor or narcotics shall be conducted under the supervision of the Secretary of the Treasury.

gether with a calendar for the month of June. The inside pages contain such items as "Prophet Projo's Favorites", "Jumping Johnny's Favorite Two", "Satellite Special", "Jack & Jill Special", "Wall Street Specials", "The Witch of Haitia", "Flying Saucer Special" and the suggestions of like authorities as to winning numbers. In addition, numbers are listed in sequence, alongside certain dates, and, in other tables, dates are listed in chronological order alongside certain numbers. Past histories of winning numbers are thus stated, together with predictions of future winning numbers. In addition, as noted, we find sprinkled throughout the sheet various recipes, horoscopes, "entertainment features" and other items.

What we have here is a publication designed to aid its readers in their search for a winning number. It performs, with respect to numbers gambling, a function similar to that performed by the publication described in United States v. Kelly, 5 Cir., 328 F.2d 227, with respect to gambling on horse races. There are marked similarities in form and content. The publication involved in the Kelly case

"  *   *   *   was printed on both sides of a single sheet of heavy white paper about 12½" x 9". The front side was filled in mostly by undated news of sporting events principally relating to horses and horse racing. The back side listed the days racing entries at four or five major race tracks, the names of the jockeys, the weight each horse will carry, track conditions, post time for each race, distance of each race, the class and value, late scratches, 'picks' for each race that will appear in official programs published by the respective tracks and the finger 'picks' selected by employees of appellants, and probable odds. The front side contained an alphabetical index of the horses that were scheduled to race, the name of the track, the number of

the races along with the number of starts, first, seconds and thirds for the past twelve months or more. It also listed the 'Trackman's Overnight Selections' for some of the tracks and contained some of the previous day's racing results, together with the mutuel prices and scratches. Where a particular issue covered five tracks there was little or no room for filling in news items of other sporting events."

In Kelly, after an exhaustive analysis of the legislative history, the above-described publication was held to come "within the ambit of 'any newspaper or similar publication' and was, therefore, exempt from the operation of the statute." The holding governs the matter before us. The publications are alike in content and function. Each serves its readers as a guide to the selection of winning choices, either horses or numbers. We see no valid distinction between them.

We conclude that there has been no violation of Title 18, § 1953.

■■■ Section 1952, however, poses a different question and a more difficult problem. The purpose of this bill,[4] was to prohibit travel in interstate commerce, or the use of the facilities of interstate commerce, in aid of racketeering enterprises.

"The legislative history likewise makes it emphatically clear that the bill is a part of the Attorney General's crime program to combat organized crime and racketeering. The Attorney General, testifying before Congress in support of the bill, cited numerous instances of the use of facilities of interstate commerce by racketeers and hoodlums to promote illegal enterprises, to distribute the proceeds among the syndicate members of illegal gambling, liquor, narcotics and prostitution, and the use of the facilities for the commission of crimes of violence in further-

---

4. U.S.Code Congressional and Administrative News, vol. 2, p. 2664, 87th Congress, First Session, 1961.

ance of their unlawful activities. He spoke of racketeers living in one state and controlling the rackets and reaping profits from those rackets located in another state.

"The following statement taken from the legislative history seems to indicate beyond question the intent of the Congress to preclude the use of interstate facilities of every kind from use by persons in violation of the laws of the states within which they reside or operate. At page 2665 of the U.S.Code Congressional and Administrative News, Volume 2, 87th Congress, First Session, 1961 there appears the following:

"The interstate tentacles of this octopus known as 'organized crime' or 'the syndicate' can only be cut by making it a Federal offense to use the facilities of interstate commerce in the carrying on of these nefarious activities.

'This bill will assist local law enforcement by denying interstate facilities to individuals engaged in illegal gambling, liquor, narcotics or prostitution business enterprises. Testimony produced at the hearings clearly demonstrated the interstate network of criminals engaged in such unlawful activities. It further demonstrated the need for the assistance of the Federal Government in view of the fact that law enforcement authorities are limited and hindered by the interstate nature of these activities.'

"By this statute Congress prohibited the use of facilities in interstate commerce and did not limit its application to cases in which there was an actual physical transportation of substantive materials in interstate commerce. To limit the word 'facilities' to transportation facilities alone (meaning by transportation facilities the actual physical transportation of some material substance) would be to defeat the very purpose of the statute. The courts should not interpret a statute in such a manner as to strip it of its meaning but rather should look to the statute as it is written and give to it the same meaning that was intended by the Congress at the time of the enactment." [5]

The facts we must now consider with respect to the alleged violations have been stipulated as follows: That defendant Locricchio travelled from Detroit to Toledo on certain dates and there obtained the forms for printing the Greensheet; that on the same dates he took the forms to the Stephens Printing Company in Sandusky, Ohio, where (after placing a telephone call) he furnished to Stephens the material contained in the "box" on the front page of the Greensheet,[6] which in-

5. United States v. Smith, D.C., 209 F.Supp. 907, 916 (1962).

6.

| | DATE | 4–5–6 | 6–7–8 | |
|---|---|---|---|---|
| NUMBERS WILL BE COMPILED FROM RACES TAKEN FROM CHURCHILL DOWNS, KENTUCKY | MAY 25 | 486 | 662 | [Calendar for month of June is printed here.] |
| | MAY 26 | 379 | 932 | |
| | MAY 27 | 213 | 315 | |
| | MAY 29 | 821 | 127 | |
| | MAY 30 | 869 | 923 | |
| | MAY 31 | 829 | | |

formation was thereupon incorporated by Stephens into the publication.

Thereafter the Greensheets were sent by common carriers from Ohio to trucking terminals in Detroit (see Ex. 7), the original freight bills reading in significant part as follows:

Shipper, Address and Point of Origin: Stephens Publishing Co. Sandy, O

Consignee, Address and Destination City: Mr. Williams will pick up Term Detroit, Mich.

At the Detroit terminals, defendants Locricchio and Azar picked up the Greensheets ("each on occasion signing the name 'Mr. Williams' in receipt therefor". Par. 7, Stipulation of Facts.) Defendant Azar had rented vehicles from Avis Rent-A-Car in Detroit for use in delivering the Greensheets, following which defendants Locricchio and Azar distributed them in the Detroit area.

As to their use it was agreed that a named witness who took "numbers lists totalling about $102.00 to $105.00 per day" would testify that the Greensheets have been used in numbers betting in Detroit for many years for the purpose of giving numbers tips to bettors, that he received bundles of these publications weekly, free of charge, and that he furnished them "only to numbers bettors to encourage them to bet." He concluded as follows:

"Pierce identifies the defendants Azar and Locricchio and states that they are individuals who have delivered the Weekly Green Sheets to him. He identified Locricchio as the individual who has at times delivered the slips which Pierce used to write numbers to him, but states that the said slips are not delivered at the same time as the Weekly Green Sheets. Locricchio has been delivering him the Green Sheets and the said Slips and Azar the Green Sheets from at least the summer of 1961, regularly, to the time of the interview, which was April 4, 1962."

It is pertinent to our analysis at this point to observe that (it is stip-ulated) the Greensheet is commonly available to those desiring to bet in "numbers" gambling, and that it promotes and stimulates such gambling, which, it is agreed and indisputable, was illegal under the laws of the State of Michigan during the time pertinent to the indictment.

Upon these facts and exhibits, so stipulated, and the reasonable inferences therefrom, the court finds that defendant Locricchio did in fact travel in interstate commerce with the intent to facilitate the carrying on of the numbers racket in the State of Michigan, and that he thereafter facilitated the carrying on of such racket by distributing copies of the Greensheet in the Detroit area, such numbers racket being an "unlawful activity" as that phrase is defined in 18 U.S.C. § 1952. The court therefore finds defendant Locricchio guilty as charged in counts 2, 5, 8, 11, 14 and 17 of the indictment.

The facts (stipulated) show that the interstate transportation of the Greensheets was effected by common carriers, and that defendant Locricchio accepted same as consignee of the interstate shipment at the Detroit terminals. It is clear at this point that defendant Locricchio has, in the words of § 1952 "use[d] [a] facility in * * * interstate commerce." Moreover, the necessary intent is abundantly clear, as well as the performance thereafter of a subsequent act of the type required by the statute. Defendant Locricchio is therefore guilty as charged in counts 3, 6, 9, 12, 15 and 18 of the indictment.

So far as defendant Azar is concerned, it cannot be found on what is before this court that he himself travelled in interstate commerce, or that he carried or sent the Greensheets therein. Neither the stipulation of facts *nor* the exhibits provide any substantial support to the government's theory that defendant Azar was an aider and abettor, a causer, or a joint venturer with respect to counts 2, 5, 8, 11, 14 and 17.

However, as has been noted, both defendants picked up the Greensheets from the Detroit terminals of the common car-

riers after they had been carried from Ohio to Detroit. Each of them, on occasion, signed as the consignee, "Mr. Williams." To this extent both defendants themselves used facilities in interstate commerce. The court finds that defendant Azar so used facilities in interstate commerce with the intent to facilitate the carrying on of the numbers racket in the State of Michigan, and that he thereafter facilitated the carrying on of the numbers racket by distributing copies of the Greensheet in the Detroit area. Defendant Azar is therefore guilty of the charges laid against him in counts 3, 6, 9, 12, 15 and 18 of the indictment.

Paragraphs 15 and 16 of the stipulation of facts refer, respectively, to a conviction of defendant Locricchio in a court of the State of Michigan and an arrest of defendant Azar. Defendants have objected to the admission of these stipulated facts as evidence, on the ground that they are irrelevant. The stipulated facts in question were unnecessary to the court's decision and were given no weight or consideration. Hence, the court need not rule on defendants' objection.

In summary, the court finds defendant Locricchio to be guilty as charged in 12 counts of the indictment, as detailed above, and defendant Azar guilty as charged in counts 3, 6, 9, 12, 15 and 18 of the indictment, being not guilty of the remaining 12 counts.

In urging that they should be acquitted of the charges against them, defendants Azar, as their "main proposition" that the Government has failed to prove "that any of their actions * * * constitute a violation of the laws of the State of Michigan * * * nor of the laws of the United States." They assert that the distribution of Greensheets violates no Michigan law, and, further, that none of their acts with respect to the Greensheets

"constitute unlawful activity within the meaning of 18 U.S.C. Section 1952".

■ Defendants miss the thrust of the law. To combat wide and nefarious interstate racketeering the Congress has made certain combinations of acts unlawful: for instance, interstate travel with intent to promote an unlawful activity, plus, thereafter the performance of any act to facilitate the carrying on of such activity. It is not required that the travel be in itself a criminal act, nor that the subsequent act be itself, unlawful, if it does in truth facilitate the carrying on. (The analogy to the overt act required in the law of conspiracy, which act may be as "harmless" as a telephone call, seems clear.)

In short, here is a device, the tip sheet, serving a purpose of catering to those wishing to participate in the numbers racket. It suggests and advises as to successful participation in the unlawful operation itself. It is stipulated, indeed, that it actually does both promote and stimulate such gambling. Upon these facts it would be a perversion of both language and logic for us to hold that such a device does not "facilitate" the unlawful operation the promotion of which it serves, and the furtherance of which it stimulates.

As with any new statute, various situations, products, and services may be hypothesized, as to which their promotion or facilitation of an unlawful activity may be arguable. We do not rule upon such cases. We confine our holding to the facts before us. Here we have a unique product, created for, and devoted to, the service of a racket. We hold that it facilitates the operation thereof within the meaning of the act.

The bond of the defendants will be continued and their cases referred to the Probation Department for pre-sentence reports.