SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

AMBASSADOR CHURCH FINANCE/DEVELOPMENT GROUP, INC., et al., Defendants.

SECURITIES INVESTOR PROTECTION CORPORATION and Fred D. Bryan, Trustee, Applicants-Appellants,

v.

PINE STREET BAPTIST CHURCH, Claimant-Appellee.

No. 81–5123.

United States Court of Appeals, Sixth Circuit.

Argued March 23, 1982.

Decided May 27, 1982.

Theodore H. Focht, Gen. Counsel, Securities Investor Protection, Washington, D. C., H. Lee Barfield, II, Leigh W. Davidson, Bass, Berry & Sims, Nashville, Tenn., for applicants-appellants.

Robert D. Tuke, Daniel W. Small, Farris, Warfield & Kanaday, Nashville, Tenn., for claimant-appellee.

Before LIVELY and MERRITT, Circuit Judges, and WEICK, Senior Circuit Judge.

LIVELY, Circuit Judge.

This case arose under the Securities Investor Protection Act of 1970, P.L. 91–598,

codified at 15 U.S.C. § 78aaa *et seq.* (The Act);[1] which, *inter alia,* provides a plan for the liquidation of failed and failing brokers and dealers in securities. The specific question to be answered in this case is whether, under the Act, an issuer of securities may ever be a "customer" of a broker-dealer with respect to the issuer's own securities. This appears to be a question of first impression, and we treat it within the narrow confines of the factual setting of this case.

## I.

Section 3 of the Act established the Securities Investor Protection Corporation (SIPC), a non-profit corporation composed of all persons registered as brokers or dealers with the Securities and Exchange Commission (SEC), with exceptions not relevant here. Section 4 created the SIPC fund for the benefit of customers of brokers and dealers. The fund is financed by assessments of SIPC members, based on their gross revenues from the securities business. Under section 5 of the Act if SIPC determines that one of its members has failed or is in danger of failing to meet its financial obligations to its customers, SIPC is authorized to seek a protective decree from a federal district court. If one or more of five conditions listed in the Act is found to exist, the district court is required to enter a protective decree and appoint a trustee for the liquidation of the broker-dealer.

Section 6 of the Act deals with liquidation proceedings. The feature of the Act which gave rise to this litigation is found in those provisions which grant a preferred position to customers of a broker-dealer in liquidation. Section 6(f)(1) of the Act states, "In order to provide for prompt payment and satisfaction of the net equities of customers of debtor, SIPC shall advance to the trustee such moneys as may be required to pay or satisfy claims in full of each customer, but not to exceed [$20,000 where the claim is for cash] for such customer...." The trustee is required to dis-

charge obligations to customers promptly. Section 6(g).

## II.

In 1974 Pine Street Baptist Church of Richmond, Virginia sought to raise funds for construction of a new building by issuing $300,000 of first mortgage bonds. The church entered into an agreement with Ambassador Church Finance/Development Group, Inc. (Ambassador), a corporation which was registered with the SEC as a broker-dealer and which was a member of SIPC. Ambassador was retained to assist in preparing and marketing the proposed bond issue. Under the agreement Ambassador contracted to prepare all documents deemed necessary and to pay for the printing costs of bonds and coupons, a prospectus and other literature and recording forms required for "the program." The agreement contemplated that most of the bonds would be sold by church members, and Ambassador was required to furnish a "program counselor" for three weeks and to conduct two or more training/steering committee meetings prior to the "kick-off" of the program. The fee for Ambassador's services was $12,000, and in addition, Ambassador agreed to use its best efforts to assist in selling any bonds which were not sold by church members. An additional fee of 6% of the principal amount was to be paid Ambassador for any bonds sold by it.

The transaction which is the foundation of the church's claim was based on an oral agreement between the church and Ambassador's president, Henry C. Atkeison, described as follows in a stipulation entered by the district court:

Atkeison also received bonds totaling $15,750 from Pine Street through United Virginia Bank on June 6, 1974. He sold these bonds but received no compensation for the sale. The reason was that he had orally agreed with Pine Street to sell $15,750 of its bonds for free because they were "incentive" bonds. Atkeison's prac-

sion.

1. Though the Act was amended extensively in 1978, this case is controlled by the 1970 ver-

tice was to sell gratuitously a certain percentage of a church's bond offering with the percentage being determined by the number of bonds that the particular church had managed to sell through its own sales force; the more bonds that church members sold, the more bonds in turn that Atkeison would sell. Atkeison's thinking was that, by agreeing to sell a certain number of bonds without a fee, he would encourage a church to really push its own sales people, hence the term "incentive." In Pine Street's case, the church members, trained by Atkeison, managed to sell enough bonds on their own to warrant Atkeison in turn selling $15,750 of "incentive" bonds. [Henry C. Atkeison and Ambassador were found by the district court to be one and the same.] The bond issue was successful. The church members sold bonds in the face amount of $272,250, Ambassador received $12,000 in bonds as its fee and $15,750 worth of "incentive bonds." Ambassador sold all the incentive bonds. One purchaser sent $2500 directly to the church, but Ambassador failed to account for $13,250 which it received from the sales. Ambassador kept no records concerning the sale of incentive bonds.

On December 17, 1974 SIPC applied to the district court for appointment of a trustee for Ambassador. The court entered a consent order finding that securities customers of Ambassador were in need of the protection furnished by the Act. A trustee was appointed for liquidation of Ambassador and appropriate orders were entered. The church filed a claim with the trustee seeking $13,250 from funds advanced by SIPC. The trustee denied the claim on the ground that he had been advised by SIPC that the church was not a "customer" of Ambassador to the extent that the church's claim was based on the loss of securities which it had issued. The church then filed a formal objection to the denial which contained a statement of "operative facts." The matter was tried by the district court on extensive admissions and stipulations of fact and the in-court testimony of an expert witness called by SIPC.

The district court found that the church came within the literal definition of "customer" contained in the Act and that there was nothing in the language of the Act or the legislative history which indicated an intention by Congress to exclude an issuer of securities from the preferred status of a customer, if the issuer otherwise met the definitional standard. For these reasons, the district court allowed the church's claim. SIPC and the trustee have appealed.

## III.

The definition which is critical to a decision in this case was contained in section 6(c)(2)(A)(ii) of the 1970 Act, 15 U.S.C. § 78fff(c)(2)(A)(ii) [the current version is found at 15 U.S.C. § 78111(2)]:

> "customers" of a debtor means persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities received, acquired, or held by the debtor from or for the account of such person (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as collateral security, or (VI) by way of loans of securities by such persons to the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, and shall include any person who has deposited cash with the debtor for the purpose of purchasing securities, but shall not include any person to the extent that such person has a claim for property which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor or is subordinated to the claims of creditors of the debtor.

The appellants, SIPC and trustee Bryan, argue that the district court erred by failing to look beyond the literal language of the definition. They contend that Congress intended to protect members of the public who invest and trade in securities, but not entities which issue them. The appellants maintain that Ambassador was, "as a matter of law," an investment banker or under-

writer with respect to the church transaction, and that this relationship does not give rise to "customer" status under the Act.

Arguing that construction of a statute which is at variance with its purpose should be avoided, the appellants have cited portions of the legislative history of the Act. They point to numerous statements to the effect that the Act was intended to restore public confidence in the securities market after a rash of failures by brokerage houses in the 1960's, and assert that this goal was to be achieved by providing a limited guarantee against loss to "conventional securities customers." Citing SEC rules and Regulation T of the Federal Reserve Board, the appellants further rely on the fact that Ambassador did not maintain any of the accounts for the church which a broker-dealer is required to establish for its customers. The church argues, on the other hand, that it was a customer of Ambassador within the plain language of the Act and that the legislative history and judicial interpretations of the Act, as well as sound policy, support the court's conclusion.

### IV.

Since the church has a claim on account of securities received by Ambassador "with a view to sale" it comes within the Act's literal definition of a customer. It is a universally recognized rule of statutory construction that a court should look first to the language of a statute to determine the legislative purpose. The Supreme Court recently applied this rule in *American Tobacco Co. v. Patterson*, —— U.S. ——, ——, ——, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982):

As in all cases involving statutory construction, "our starting point must be the language employed by Congress," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337 [99 S.Ct. 2326, 2330, 60 L.Ed.2d 931] (1979), and we assume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States*, 369 U.S. 1, 9 [82 S.Ct. 585, 591, 7 L.Ed.2d 492] (1962). Thus "[a]bsent a clearly expressed legislative

intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766] (1980).

However, reliance on the literal language of a portion of a statute is improper if it leads to an interpretation which is inconsistent with legislative intent expressed elsewhere in the statute or legislative history, or to an absurd result. *Cf. United States v. Public Utilities Commission of California*, 345 U.S. 295, 315–16, 73 S.Ct. 706, 717–718, 97 L.Ed. 1020 (1953); *United States v. Brown*, 333 U.S. 18, 27, 68 S.Ct. 376, 380–381, 92 L.Ed. 442 (1948); *United States v. Kelly*, 328 F.2d 227, 236 (6th Cir. 1964). Even where the language seems to be clear, an ambiguity may exist if it appears that the legislature did not consider a particular problem which a court is called upon to resolve. The Supreme Court considered such a situation in *Rose v. Lundy*, —— U.S. ——, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Speaking through Justice O'Connor the Court stated:

Because the legislative history of § 2254, as well as the pre-1948 cases, contains no reference to the problem of mixed petitions, in all likelihood Congress never thought of the problem. Consequently, we must analyze the policies underlying the statutory provision to determine its proper scope. *Philbrook v. Glodgett*, 421 U.S. 707, 713 [95 S.Ct. 1893, 1898, 44 L.Ed.2d 525] (1975) (" '[i]n expounding a statute, we must ... look to the provisions of the whole law, and to its object and policy.' [citations omitted]"); *United States v. Bacto-Unidisk*, 394 U.S. 784, 799 [89 S.Ct. 1410, 1418, 22 L.Ed.2d 726] (1969) ("where the statute's language seem[s] insufficiently precise, the 'natural way' to draw the line 'is in light of the statutory purpose' [citation omitted]"); *United States v. Sisson*, 399 U.S. 267, 297–298 [90 S.Ct. 2117, 2133–2134, 26 L.Ed.2d 608] (1970) ("[t]he axiom that courts should endeavor to give statutory language that meaning that nurtures the

policies underlying the legislation is one that guides us when circumstances not plainly covered by the terms of the statute are subsumed by the underlying policies to which Congress was committed"); *Unexcelled Chemical Corp. v. United States*, 345 U.S. 59, 64 [73 S.Ct. 580, 583, 97 L.Ed. 821] (1953) ("[a]rguments of policy are relevant when for example a statute has an hiatus that must be filled or there are ambiguities in the legislative language that must be resolved").

At ————, 102 S.Ct. at 1202–1203 (footnotes omitted).

We believe Congress did not directly consider the question of whether an issuer of securities may be a customer under section 6 of the Act. Accordingly, we look beyond the definitional language of section 6(c)(2)(A)(ii) to the language of the entire Act, the legislative history and any relevant judicial interpretations.

As introduced in the House of Representatives the bill which became the 1970 Act was styled, "An Act to provide greater protection for customers of registered brokers and dealers and members of national securities exchanges." H.R.Rep.No.91–1613, 91st Cong., 2d Sess. (1970), reprinted in [1970] U.S.Code Cong. & Adm.News 5254, 5255, states, "The primary purpose of the reported bill is to provide protection for investors if the broker-dealer with whom they are doing business encounters financial troubles. In these circumstances public customers sometimes encounter difficulty obtaining their cash balances or securities from the broker-dealers." In its first consideration of the Act, the Supreme Court, relying on legislative history, stated its purpose as follows:

Following a period of great expansion in the 1960's, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms. Customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a "domino effect" involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers. S.Rep.No.91–1218, pp. 2–4 (1970); H.R.Rep.No.91–1613, pp. 2–4 (1970).

*S.I.P.C. v. Barbour*, 421 U.S. 412, 415, 95 S.Ct. 1733, 1736, 44 L.Ed.2d 263 (1975). None of these statements of purpose rules out the possibility that an issuer of securities may be a customer entitled to the protection of the Act. Furthermore, though Congress sought to restore investor confidence by protecting customer assets from the disastrous effects of broker-dealer failures, we can find no language in the Act which limits "customers" beyond the definition contained in section 6(c)(2)(A)(ii).

There are indications in the legislative history that Congress was seeking to restore investor confidence by protecting customers who deal in relatively small securities transactions. Remarks of a number of Senators and House members contained references to the necessity for protecting small investors as a means of restoring confidence. However, no legislator or witness asserted that a person who delivered securities to a registered broker for the purpose of sale was not a "customer" because the person delivering them was also the issuer of the securities.

■ The church was an unsophisticated participant in the securities market. Though it relied on Ambassador's supposed experience and knowledge in bringing its modest bond issue to market, it is clear that Ambassador was not acting solely as an investment banker or underwriter. The expert witness for SIPC testified that his firm, acting as an investment banker or underwriter, would never train the issuer to promote and sell bonds; the selling of bonds is a function of the investment banker. The witness also testified that he knew of no other investment banker or under-

writer who would rely on the issuer to sell its own securities. Finally, this witness stated that his firm had never sold "incentive bonds."

Though the expert witness believed that Ambassador's relationship with the church was that of investment banker or underwriter, his entire testimony makes it clear that the relationship was a hybrid one. Ambassador undertook a dual role with respect to the Pine Street Baptist Church issue. Some of its functions resemble those of an investment banker or underwriter. However, the transaction on which the church's SIPC claim is based was of a kind which is outside the function of an investment banker, and was completely unknown to the expert witness. When the church delivered $15,750 in incentive bonds to Ambassador the relationship was that of customer and broker. These bonds were the property of the church and had never been in the possession of Ambassador or Atkeison until they were delivered to Atkeison for sale. In this transaction the church was "trading in securities," the hallmark of a customer, according to SIPC. The fact that Ambassador performed other services for the church which more nearly resembled those of an investment banker or underwriter is immaterial. This claim is based on Ambassador's failure to remit the proceeds from the sale of entrusted securities. We do not decide whether an issuer of securities who deals with an investment banker or underwriter only in more traditional ways may be a "customer" under the Act. The facts of the present case lead us to the conclusion that the church was a customer with respect to the incentive bonds.

The cases relied upon by SIPC and the trustee do not require a contrary conclusion. On at least two occasions the Second Circuit has refused to apply the language of section 6(c)(2)(A)(ii) literally in determining that an applicant for protection was not a customer. The question in *S.E.C. v. F.O. Baroff Company, Inc.*, 497 F.2d 280 (2d Cir. 1974), was "whether a voluntary lender of securities to a failing brokerage house, who made his loan to help out the company and not for a purpose related to securities trading or investments, qualified under the Act's scheme." *Id.* at 281. The court found that such a lender was not a protected customer of the broker despite the fact that the definitional language appeared broad enough to include him. The legislative history was examined and the court concluded that the Act was intended to protect only "trading customers" and "public customers" of brokers. A person who becomes a creditor of a broker in some manner which does not involve securities trading or investment is not covered. In the case of a loan of securities to a broker there are no indicia of a fiduciary relationship between the lender and the broker. The lender is just an ordinary creditor of the broker. The same conclusion was reached in *S.I.P.C. v. Executive Securities Corp.*, 556 F.2d 98 (2d Cir. 1977), which involved a loan of securities to a brokerage firm in return for cash collateral equal to the market value of the loaned shares. The court found that while the lenders were secured creditors with the right to demand additional cash collateral, the necessary indicia of a fiduciary relationship were missing.

In *S.I.P.C. v. Morgan, Kennedy & Co., Inc.*, 553 F.2d 1314 (2d Cir.), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976), the court held that the individual beneficiaries of a profit sharing plan did not qualify as customers of a failed brokerage house which owed the plan money. All investment decisions were made by the trustees of the profit sharing plan which was the only customer of the broker. The individual beneficiaries of the plan had no dealings with the broker and the broker never held any property of theirs.

The claimants in *S.E.C. v. Bove & Co.*, 378 F.Supp. 697 (S.D.N.Y.1974), and *S.E.C. v. Seggos & Co.*, 416 F.Supp. 280 (S.D.N.Y. 1976), were denied the protection of the Act because neither had physically delivered securities to the broker when the trustee was appointed, despite an agreement with the broker to deliver the securities at an earlier date. In both decisions the court emphasized the fact that no securities had been "entrusted" to the broker. Entrustment

was found to be a key factor in determining who qualified as a customer.

As we have indicated, none of the cited decisions require a holding that the church did not qualify for protection in the present case. The incentive bonds were delivered to Ambassador for the purpose of sale. There was an entrustment of a customer's property to a broker and a fiduciary relationship existed. In this transaction the church was no different than an owner of securities who walks into a brokerage office from the street and leaves securities with the broker for sale. The church was a "public" or "trading" customer with respect to the sale of incentive bonds and was entitled to the protection of the Act.

The appellants make much of the fact that Ambassador did not maintain a customer account in the name of the church and did not charge a commission for selling the incentive bonds. It is not likely that Congress, in seeking to protect the assets of small transaction customers of broker-dealers, intended to make eligibility for protection depend on whether the broker complied with rules of the SEC or practices of the trade. These are matters over which the broker has complete control. The trusting customer is not to be penalized for choosing a careless, unethical or dishonest broker. The primary purpose of the Act is to assure the unsophisticated participant in securities transactions that there is protection when a bad choice of brokers is made.

In summary, the case before us did not involve a typical issuer/investment banker or underwriter relationship. Ambassador's role was a multi-purpose one. Though some of its duties resembled those ordinarily performed by an investment banker or underwriter, others were distinctly foreign to that role. Likewise, it is clear that the church was more than an issuer. It had primary responsibility for sale of the bonds despite having employed and having paid Ambassador to assist. With respect to the incentive bonds the church was in the position of an investor desiring to dispose of securities, and the fact that it was also the issuer was immaterial.

The judgment of the district court is affirmed.