**In the Matter of an Application to Enforce Administrative Subpoena Duces Tecum of the SECURITIES AND EXCHANGE COMMISSION, Applicant,**

v.

**WALL STREET TRANSCRIPT CORPORATION by Richard A. Holman, Respondent.**

**No. M18–304.**

United States District Court
S. D. New York.
Nov. 22, 1968.

Securities and Exchange Commission by Maylon M. Frankhauser, New York Regional Administrator, Richard V. Bandler, Associate Regional Administrator, Edward H. Nordlinger and Murray L. Finebaum, New York City, Attorneys.

Pollack, Greenspoon & Singer, by Samuel N. Greenspoon, New York City, for respondent.

## OPINION

TYLER, District Judge.

This is a motion by the Securities and Exchange Commission ("SEC") for an order pursuant to Section 209(c) of the Investment Advisers Act of 1940, 15 U. S.C. § 80b–9(c), requiring the respondent to appear and testify and to produce certain documents to be described hereinafter.

Since this motion raises interesting and troublesome questions concerning the comparatively broad powers of the

SEC to investigate under the Investment Advisers Act of 1940, it is desirable that the background of the issuance of the subpoena in question, the arguments of the parties and the facts adduced for and against the motion be set forth in some detail.

### The Order of Investigation and the Resultant Subpoena

Pursuant to the relevant provisions of the Act and in order to determine whether violations of the Act had occurred, the SEC on July 27, 1967 issued a formal order directing that an investigation be made into the matter of the Wall Street Transcript Corporation ("Transcript"). The order designated certain named agents and officers of the SEC to conduct the investigation and empowered them to "administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence and require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other materials deemed relevant and material to the inquiry". Pursuant to this order, one of the officers of the SEC named therein, Richard V. Bandler, issued a subpoena duces tecum to the respondent on March 18, 1968 requiring respondent by its president, Holman, to appear in the Commission offices in New York on April 1, 1968.[1] A few days prior to the return date, counsel for respondent by correspondence and perhaps oral communications as well, endeavored to persuade the SEC to withdraw the subpoena and to drop the investigation. These efforts continued through the month of April and apparently into May and June of this year. Finally, the return date for

the subpoena was rescheduled for July 29, 1968, on which day Holman appeared and refused to answer any questions or to give any information other than his name, business and home addresses and telephone numbers. Thereafter, the SEC, accepting that respondent effectively refused to honor the subpoena, brought on this motion which, as the statute makes clear, is permissible in order to invoke the contempt powers of this court.

Parenthetically, it should be noted that the formal order of the SEC heretofore mentioned recites that, according to the SEC's public official files, in September, 1958 a firm known as R. A. Holman & Co., Inc. was registered with the Commission as a broker and dealer, that Richard A. Holman, the same man who is president of the respondent here, was the president of Holman & Co. and that thereafter on December 15, 1965 the Commission revoked the registration of Holman & Co., expelled it from membership in the National Association of Securities Dealers, made permanent a temporary suspension of a Regulation A exemption and found that Holman, among others, was a cause for its order with respect to Holman & Co.

### The Applicable Statutory Provisions

Section 209(b) of the Act provides:

"For the purposes of any investigation or any proceeding under this title, any member of the Commission or any officer thereunder designated by it is empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memo-

---

1. The subpoena required and requires production of the following documents: All of the following relating to the business of Wall Street Transcript Corporation during the period from January 1, 1967 until the present:

1) Copies of all advertisements, notices, circulars, newspaper articles and any other writings used in connection with the sale of The Wall Street Transcript.

2) All correspondence with subscribers and prospective subscribers of The Wall Street Transcript.

3) All documents, agreements, memoranda, correspondence and any other writings relating or containing reference to the obtaining of reports, comments, management speeches and any other written materials for publication in The Wall Street Transcript.

randa, contracts, agreements or other records which are relevant or material to the inquiry."

Section 209(a) of the Act further states:

"Whenever it shall appear to the Commission, either upon complaint or otherwise, that the provisions of this title or of any rule or regulation prescribed under the authority thereunder, have been or are about to be violated by any person, it may in its discretion require, and in any event shall permit, such person to file with it a statement in writing, under oath or otherwise, as to all the facts and circumstances relevant to such violation, and may otherwise investigate all such facts and circumstances."

As previously stated in brief, Section 209(c) of the Act makes provision for the SEC to enforce its subpoenas by applying to a federal court:

"In case of contumacy by, or refusal to obey a subpoena issued to, any person, the Commission may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of * * * records. * * *"

This particular section goes on to provide that the court may issue an order requiring such person to appear, produce records and testify on the matter under investigation and that the failure to obey any such order of the court may be punished by the court as a contempt thereof.

Of importance to the issues here, Section 202 of the Act defines those persons who are deemed investment advisers thereunder as follows:

" 'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include * * (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation; * * *."

### The Contentions of the Parties

In support of its motion, the SEC submits that its subpoena and investigation are valid and clearly within the scope of its authority as conferred by Section 209(c) of the Act, see Oklahoma Press Publishing Company v. Walling, 327 U. S. 186, 208–216, 66 S.Ct. 494, 90 L.Ed. 614 (1946), that production of the records called for in this particular subpoena is reasonable and necessary and that the subpoena requirements are not unduly oppressive and burdensome. More particularly, the SEC asserts that it is premature for respondent to contend that it is a bona fide newspaper or financial publication specifically excluded by the provisions of Section 202 of the Act. Put differently, the SEC contends that even though its investigation may develop that respondent is a bona fide newspaper or financial publication, that is a question to be determined in the first instance by the Commission and not by this court. Finally, the Commission opposes respondent's argument that if this investigative subpoena be deemed valid on the face of the Act, then the Act insofar as it pertains to respondent is unconstitutional in that it deprives respondent of its First Amendment freedoms.

It is germane to consider the submission of the SEC and its affidavits in support of this motion. The Commission does not recite that it has any complaints or specific information to the effect that the respondent is acting or may be acting as an investment adviser without registering as such as required by the Act. Rather, the SEC restricts

itself to the following rather limited factual submissions:

1. In a supplemental affidavit filed by a Commission attorney, various advertisements of the respondent which have appeared in other newspapers are set forth, along with allegations of the affiant to the effect that these advertisements indicate that the Transcript has held itself out to the public as an investment advisory publication.

2. The SEC suggests that the contents of various issues of the Transcript handed up to the court and made part of the record on this motion indicate on their face that the Transcript holds itself out as an investment adviser.

3. Admitting that the Transcript devotes a major portion of each issue to reprinting market comments by clearly identified broker-dealer firms and their analysts, the SEC submits that the Transcript exercises "some selectivity in determining what material will be presented to its readers". Thus, the Commission expresses concern that selectivity may mean that the respondent is seeking to advise more than it is to inform.

For its part, respondent has submitted affidavits and a brief in opposition to the subpoena and investigation. In substance, respondent urges that the SEC has no jurisdiction to investigate its affairs or to issue the subpoena; that the subpoena was and is not authorized by the Act; that the investigation and issuance of the subpoena are not within the power of Congress to authorize; and that the subpoena in any case is unnecessarily broad, coercive, harassing and in derogation of the First and Fourth Amendment rights of the respondent.

### Discussion, Findings and Conclusions

■ The broad question presented by this enforcement motion of the SEC is whether or not the inquiry is lawful. I assume that, as the SEC argues, the burden of proving that the investigation is unlawful is upon the respondent. See

Mississippi Road Supply Co. v. Walling, 136 F.2d 391 (5th Cir. 1943). Historically, the courts have been reluctant to interfere with agency investigations where the inquiry is reasonably within the statutory powers and scope of the agency as set out by Congress. In Oklahoma Press Publishing Company v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), the Supreme Court ruled that an investigative subpoena issued by a federal agency with enforcement powers is valid if it satisfies three criteria:

1. "The disclosures sought shall not be unreasonable * * *" 327 U.S. at 208, 66 S.Ct. at 505;

2. "The investigation be for a lawfully authorized purpose within the power of Congress to command * * *" Id. at 209, 66 S.Ct. at 505; and

3. The investigating officer "shall not act arbitrarily or in excess of his authority * * *" Id. at 216, 66 S.Ct. at 509.

■ More recently, the Supreme Court has held that administrative agency subpoenas should be enforced where an investigation is conducted pursuant to a legitimate purpose, where the inquiry made is relevant to such purpose and seeks to elicit information not already within the knowledge of the agency and, of course, where enforcement of the subpoenas does not constitute an abuse of the court's process. United States v. Powell, 379 U.S. 48, 58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).

In the light of these authorities, this court must determine whether or not respondent has carried its burden of establishing that the SEC's present inquiry is in excess of its authority, or not within the power of Congress to permit or command, or unreasonably oppressive; moreover, this court must be certain that enforcement of the subpoena does not lead to abuse of its process. Since the Commission has received no complaints concerning the Transcript as an investment adviser and has offered no evidence other than the aforesaid is-

sues of the Transcript and its advertisement in other periodicals, the inquiry must be focused on the Transcript itself —and upon the undisputed information concerning its publication and distribution. It is here that the answer to perhaps the most disputed factual issue raised on this motion—whether or not the Transcript is a bona fide newspaper or financial publication—presumably may be found. But important as this last question may be, there is a threshold problem which may be as important and more difficult. As indicated, the first thrust of respondent's submission is that this court, not the SEC, must decide whether or not the Transcript is one of the class excluded by Section 202 from coverage by the Act. Conversely, the Commission urges that the question of "coverage" by the Act of respondent and its activities is "prematurely raised" before the court or, more precisely as I view it, that the question of coverage under settled federal law is left to the agency for initial determination. See 1 Davis on Administrative Law (Treatise), § 3.12, at p. 220, and cases therein cited.

 There is much to be said for the proposition that the SEC should be permitted to investigate upon the theory that its special competence in the field is precisely that which Congress means to be determinative of such questions as to who is and who is not an investment adviser embraced by the Act. Also, as suggested above, there is a substantial line of cases which hold that a federal district court, on a motion to enforce an administrative subpoena, is not to inquire into the issue of coverage—i. e. whether the statute under which the agency purports to act "covers" the firm or person against whom the agency is acting. Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L. Ed. 424 (1943) ; see also Davis, supra. As Davis makes clear, *Endicott Johnson* and the progeny which it has spawned normally preclude district courts from deciding the issue of coverage before the administrative agency has had an opportunity to rule on that issue. The Supreme Court's ruling in *Endicott Johnson* in effect was reaffirmed in the later case of Oklahoma Press Publishing Co. v. Walling, and again more recently in United States v. Powell, both referred to earlier in this opinion.

In my view, however, none of these precedents is on all fours with the circumstances presented in this case. The coverage cases have involved, for the most part, relatively clear-cut problems of jurisdiction of the agency to carry out a particular investigation—i. e. they have dealt with respondents whose activities, at least in the general sense, clearly lay within the jurisdiction of the agency seeking judicial enforcement of an investigatory subpoena. In none of those cases which I have read did it appear that the enforcement of the subpoena would involve the possible violation of First Amendment rights. Clearly, the SEC seeks to enlist court assistance in obtaining the names of subscribers, advertisement techniques and the sources of information and reports printed in the Transcript, which are the vital organs of any publishing enterprise. I believe, therefore, that the Commission's possible intention to apply the Act to what appears to be a bona fide newspaper "carries the seeds of a constitutional controversy", United States v. Rumely, 345 U.S. 41, at 43, 73 S.Ct. 543, at 544, 97 L.Ed. 770 (1952), and that thus this is not a typical "coverage" case to be decided by the SEC rather than the court under the doctrine of *Endicott Johnson*.

 It is true that in Oklahoma Press Publishing Co. v. Walling, supra, Mr. Justice Rutledge, writing for the majority, expressly rejected petitioners' principal argument that the free press clause of the First Amendment precluded "any possible application of the Fair Labor Standards Act to the business of publishing and distributing newspapers". 327 U.S. at 192, 66 S.Ct. at 497. Nevertheless, I conceive the circumstances and issues of that case to be substantially distinguishable from the

**304**

present controversy. In *Oklahoma Press*, the Court was concerned with a subpoena duces tecum which, although it included a demand for documents bearing on the question of coverage by the statute, was more narrowly drawn than the present subpoena of the SEC. Also, the exclusionary or exempting provisions of the Fair Labor Standards Act (Section 13(a)) indicated on their face a clear Congressional intention to cover employees of certain types of publications or newspapers such as petitioners. Most important, as the majority opinion observed, it was obvious that the Fair Labor Standards Act and the investigation thereunder sought was directed at a specific problem of elimination of low wages and long hours; thus, in the words of Mr. Justice Rutledge, "(t)he (First) Amendment does not forbid this or other regulation which ends in no restraint upon expression * * *." 327 U.S. at 193, 66 S.Ct. at 497. In the case at bar, I reason that the Commission's broad inquiry under the Act can end only in restraint of expression by the Wall Street Transcript. If a newspaper operates under the threat of disclosure to a government agency of its news sources and subscribers' identities, for example, it will be cautious, to say the least, about what it prints. Its "caution" will only increase when its advertisers become apprehensive and its subscribers become intimidated by government scrutiny. This is classic restraint of expression which needs no further elaboration here. Plainly, neither the First Amendment nor the powers conferred by Congress in the Act upon the SEC permit an inquiry which can only lead to such a restraint of expression by a newspaper. Finally, as is at least implicit from what has already been said, under the unusual circumstances here presented, this court must decide the question of "coverage".

As the parties' arguments suggest, the problem of coverage has two dimensions, one statutory and the other constitutional. In actuality, the two may blend more closely than this opinion and the briefs of counsel have occasionally suggested; nevertheless, at least for purposes of discussion, the problem lends itself to this bifurcated analysis.

On the statutory level, respondent argues very simply that since it has shown that the Wall Street Transcript is a bona fide newspaper or financial publication, it necessarily follows that respondent is excluded from the Act's coverage—i. e. that Congress has expressly withheld from the Commission jurisdiction to investigate newspapers and financial publications. On the constitutional level, the Transcript urges that the all-embracing nature of the subpoena and the fact that the Act is a licensing statute establish that the Commission's investigation necessarily infringes its First Amendment rights. Thus, in order to evaluate these arguments, it is necessary to consider the nature of the Transcript as a publication and to examine the language and legislative history of the Act, and, most particularly, Section 202 thereof.

The Transcript is published every Monday in New York City. It is distributed through the mail[2] and at newsstands. A typical issue of the Transcript includes reports issued by brokerage houses on various securities, news of offerings of bonds and stocks, speeches made by corporate, financial and government personages, news concerning name changes of companies, news concerning executive promotions and transfers, news concerning mergers and acquisitions and editorials on various subjects with, it would appear, principal emphasis on financial and economic matters. As the SEC points out, the greater part of each issue included in the record seems to be devoted to securities reports prepared by analysts of various firms, whose names are clearly indicated at the heading of each report, in each case.

2. The paper has a second-class postage permit from the United States Post Office Department.

These reports are accompanied by a rather large print caption on the first page of each issue to the following effect:

"Note: For additional information about a report, write direct to the broker at address shown" [3]

The Transcript commenced publication in June, 1963. It now has about 8,000 subscribers, including universities, libraries, corporations, individuals, trust companies, accounting firms, mutual funds, brokers, insurance companies and government agencies. From time to time, the Transcript places advertisements of its issues in the New York Times, the Wall Street Journal and various financial journals. As previously indicated, one of the attorneys for the SEC has submitted an affidavit suggesting that some of these advertisements on their face indicate that the Transcript is or may be an investment adviser. A typical advertisement of this kind is to be found as Exhibit I attached to the affidavit of Marvin E. Jacob, Esq. Specifically, the SEC complains about the caption of this advertisement appearing in the New York Times Sunday September 17, 1967 issue. This caption in part reads: "What's Right for You

\* \* \* Now?" From this, the SEC would have the court infer that the Transcript in a thinly veiled fashion purports to be making specific recommendations or advice for buyers of securities. Similarly, the Commission is concerned about the textual message, "You will be surprised how the Wall Street Transcript can help you maximize your profit potential". There are other matters to be found in this particular advertisement which counsel for the Commission does not mention. For example, right under the supposedly offensive caption to this advertisement is the text in relatively large print, "Your answer may be among these reports, comments and managements speeches \* \* in full original text \* \* \* in the current issue of the Wall Street Transcript". At most, I construe such advertisements to suggest that an individual investor might be interested in some of the publications which are listed and which appear in a current issue of the Transcript. I cannot draw the sinister inference which the Commission apparently draws with respect to any of these advertisements. They are not substantially different from advertisements placed by other financial journals with,

---

3. Additionally, on the second page of each issue of the Transcript, the masthead page, the following disclaimer appears: "The Wall Street Transcript publishes security reports and comments of others in their entirety as a service to subscribers. The Wall Street Transcript does not in any way endorse or guarantee the accuracy or reliability of any of the information, statements, or opinions expressed in the reports by the firms who have written them. We take due care to transcribe accurately what has been written by others but because of the possibility of human and mechanical error, we cannot assume any liability for the correctness of the transcription. Errata, when discovered, are corrected. The Wall Street Transcript further points out that in the case of a report published by a broker-dealer, there is usually a statement which indicates that the report is not to be considered as an offer to sell or a solicitation of an offer to buy any security; that the material has been obtained from various sources but is not guaranteed as to accuracy or authenticity; that the report does not purport to include all the information available on the mentioned company or companies, as the case may be; that the firm which has written the report may have a position in the securities mentioned and may trade therein from time to time, and further, that officers, directors or partners of the firm may be directors of or own securities of the company reported upon and may trade therein, and that no liability of any kind is assumed by the broker-dealer which has written the report for the accuracy of the information contained therein. We point out further that of course all opinions expressed are subject to change without notice. Neither the information, nor any opinion which may be expressed, constitute a solicitation for the purchase or sale of any securities referred to herein."

for example, newspapers of general circulation. Moreover, these advertisements do not appear to suggest or advise a potential investor in any way except for what I assume even the Commission would agree is the acceptable way of making financial information available through the Transcript. Specific securities are not touted by the Transcript. Not even special categories or types of securities are recommended. In sum, the Transcript seems to have a policy of printing speeches, analyses and articles about all manner of securities with "author credits" or bylines clearly indicated to the reader.

Upon the available evidence, the Transcript appears to be a bona fide "financial publication of general and regular circulation". Moreover, the Transcript has all the usual indicia of a newspaper as that term is generally understood by the public and is normally used to indicate an entity protected by the free press clause of the First Amendment. United States v. Kelly, 328 F.2d 227 (6th Cir. 1964); United States v. Azar, 243 F.Supp. 345 (E.D.Mich.1964). The SEC has furnished no persuasive evidence to the contrary. Consequently, literal construction of Section 202 requires the conclusion that the SEC is attempting to investigate an entity which is excluded from the Act's coverage.

Nothing in the legislative history of the Act in general or Section 202 in particular suggests otherwise. In actuality, the legislative history is relatively uninformative respecting the precise issues raised on this motion. After a series of hearings wherein the views of the Commission and the investment industry were explored, the final bill which led to the Act, H.R. 10065, was reported out to a Committee of the Whole House for consideration. 86 Cong.Rec. 9807 (1940). In August, 1940, proceedings before the Committee led to little comment concerning the definition of "investment advisers" which is here relevant. See 86 Cong.Rec. 9808–9814. The debate in the Senate on August 8, 1940 was just as uninformative. It is true that reference to the definition of "investment advisers" was made in the report of the Banking and Currency Committee on S. 4108, a Senate precursor of H.R. 10065. There it was said, *inter alia*, that advisers are persons engaged in the business of advising others "or who for compensation and as part of a regular business issue or promulgate analyses of reports concerning securities". See 86 Cong.Rec. 10077 (1940).

The Act was finally passed on August 8, 1940 by the Senate. The above quoted portion of the Senate report, of course, found its way into the definition contained in Section 202. It is the basis of one of the SEC's arguments on this motion. In effect, the Commission argues, the Transcript as part of its regular business issues or promulgates analyses of reports concerning securities. Moreover, the SEC points out, correctly in my view, that the Transcript cannot bring itself within the exemption in Section 202(11) (C) of "any broker or dealer whose performance of such services (i. e. investment advice) is solely incidental to the conduct of its business as a broker or dealer". But, as I see it, this is beside the point. The Transcript is not "exempted" from the Act. It is excluded from the Act's coverage by virtue of its unrebutted showing that it is a bona fide "financial publication of general and regular circulation". Moreover, as informed observers in the field of securities regulation have observed, where a broker or dealer or other firm or person discloses the identity of the author of a financial report circulated by it, and such broker or dealer or firm does not adopt the report as its own, it would not seem to be a person who "issues or promulgates" the report within the meaning of the relevant language of the Act. Loss, Securities Regulation, Vol. II, page 1400 (1961).

Despite the dearth, if not total absence, of specific legislative history on the First Amendment issue, I believe that Congress, by the language it used

in Section 202 of the Act, meant to avoid exceeding its powers in establishing the SEC's jurisdiction for regulating investment advisers. Put differently, it seems reasonable to infer that Congress was aware that it could not lawfully command or authorize regulation and licensing by the SEC of bona fide newspapers in the light of the teaching of the First Amendment. See Oklahoma Press Publishing Co. v. Walling, 327 U. S. at 209, 66 S.Ct. 494; United States v. Rumely, 345 U.S. at 43–46, 73 S.Ct. 543; Watkins v. United States, 354 U.S. 178, at 197, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957).

To find and conclude that the Transcript is clearly excluded from the Act's coverage may be a relatively easy task for the court on the present record, but the question remains, of course, as to whether Endicott Johnson Corp. v. Perkins, supra, and similar authorities heretofore discussed permit such action by a district court. Although I can find no affirmative precedents in point, I believe that the First Amendment issue here present leads inescapably to a determination that this court and not the SEC must decide the question of coverage. Traditionally, the federal courts have been sensitive to First Amendment rights and zealous to protect them when properly raised. The all-encompassing nature of the subpoena sought in this case by the SEC goes to the jugular of the Transcript as a publishing firm. Compliance with the subpoena, even if followed by an administrative determination of "non-coverage" by the Act, would work all the damage heretofore discussed as constituting an unconstitutional restraint on the free press as we know it. See United States v. Rumely, 345 U.S. at 57–58, 73 S.Ct. 543 (concurring opinion of Justice Douglas).

■■ Of necessity, then, this court must stay the hand of the SEC now; it cannot follow the normal course of permitting the agency to decide, if only ini-

tially, the question of coverage. As suggested heretofore, the courts have a clear duty to anticipate and guard against deprivations of First Amendment rights. Also, by reason of their broader and more varied jurisdiction, federal district courts are better equipped than administrative or regulatory agencies to vindicate constitutional rights. Consequently, I conceive that it would be an abuse of this court's process and jurisdiction to put its imprimatur of approval upon the pervasive subpoena which is here directed against a newspaper and financial publication of general circulation. See United States v. Powell, 379 U.S. at 58, 85 S.Ct. 248; Jaffe, The Judicial Enforcement of Administrative Orders, 76 Harvard L.R. 865, at 868–69 (1963).

■ To recapitulate, I do not hold that all persons and entities which claim exclusion from coverage by the Act are entitled to court-ordered insulation from investigation by the SEC. Similarly, I do not say that all such claimants are entitled to court determination of the preliminary issue of coverage. But where, as here, a publisher which presumptively is entitled to the protection of the First Amendment can make virtually an unrebutted showing that it is a bona fide newspaper and financial publication, a federal court should stay the hand of the investigating agency. An entirely different question would be presented if the SEC had complaints or other evidence of conduct by the publisher outside the normal functions of compiling and distributing an excluded publication. In the latter situation, I believe that the Commission should be entitled to proceed with court assistance under Section 209 if necessary, provided, of course, that the scope and particulars of the subpoena were not unreasonable or oppressive.

The motion for enforcement is denied. It is so ordered.