In the Matter of an Application to Enforce Administrative Subpoena *Duces Tecum* of the SECURITIES AND EXCHANGE COMMISSION, Applicant-Appellant,

v.

WALL STREET TRANSCRIPT CORPORATION, by Richard A. Holman, Respondent-Appellee.

No. 296, Docket 33350.

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1969.

Decided Feb. 2, 1970.

David Ferber, S.E.C., Washington, D. C. (Philip A. Loomis, Jr., Gen. Counsel, Theodore Sonde, Special Counsel, and Harvey L. Pitt, S. E. C., Washington, D. C., Richard V. Bandler, Associate Regional Administrator, Edwin H. Nordlinger, Special Counsel, and Michael S. Leo, New York Regional Office, S. E. C., New York City, on the brief), for appellant.

Samuel N. Greenspoon, New York City (Martin I. Kaminsky, Jonathan S. Gaynin, and Pollack, Greenspoon & Singer, New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, and DANAHER * and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

On July 27, 1967, the Securities and Exchange Commission ordered an investigation of the Wall Street Transcript Corp., pursuant to § 209(a) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–9(a), to determine whether it was acting as an investment adviser in violation of § 203 of that Act, 15 U.S.C. § 80b–3, the registration provision. This action resulted, not from any specific complaint received,[1] but from a staff report concerning the nature of the appellee's publication, *The Wall Street Transcript*, issued weekly in a newspaper format,[2] and the advertising used in its sale to the public.[3]

---

* John A. Danaher, Senior Circuit Judge of the District of Columbia Circuit, sitting by designation.

1. The appellee suggests in a footnote to its brief that the investigation was part of a "staff vendetta" against the *Transcript's* owner whose broker-dealer registration was revoked and who was expelled from membership in The National Association of Securities Dealers and enjoined for securities laws violations. See R. A. Holman & Co. v. SEC, 366 F.2d 446 (2 Cir. 1966), amended *per curiam*, 377 F.2d 665, cert. denied, 389 U.S. 991, 88 S.Ct. 473, 19 L.Ed.2d 482 (1967); SEC v. R. A. Holman & Co., 366 F.2d 456 (2 Cir. 1966), cert. denied, 389 U.S. 991, 88 S.Ct. 473, 19 L.Ed.2d 482 (1967). No basis is suggested for this charge, which does not appear to have been mentioned in the court below. Contrast Shasta Minerals & Chemical Co. v. SEC, 328 F.2d 285 (10 Cir. 1964).

2. The *Transcript* is printed on newsprint, in the form of a tabloid newspaper. It appears weekly and is sold by subscription for $180 per year or by the single copy for $5 per issue. An inspection reveals its primary content to be reports upon specific securities, each of which is identified with the name and address of a broker-dealer firm; and the masthead states, in part:

"The Wall Street Transcript publishes security reports and comments of others

The *Transcript's* principal operating officer, Richard A. Holman, appeared at a hearing July 29, 1968, in response to the Commission's subpoena *duces tecum*. On the advice of counsel, Holman refused to produce any documents or answer any questions whatsoever other than to state his name, addresses, and telephone numbers. The Commission then applied to the district court pursuant to § 209(c) of the Act for enforcement of its subpoena, which called for the production of certain advertising materials and correspondence with sub-scribers, prospective subscribers, and suppliers of securities reports published in the *Transcript*.[4]

The court below refused enforcement, SEC v. Wall Street Transcript Corp., 294 F.Supp. 298 (S.D.N.Y.1968). It concluded that the *Transcript* is a "bona fide newspaper" or "financial publication of general and regular circulation" which is expressly excluded from the definition of "investment adviser" by § 202(a) (11) (D) of the Act itself, 15 U.S.C. § 80b–2(a) (11) (D),[5] and there-

---

in the entirety as a service to subscribers. The Wall Street Transcript does not in any way endorse or guarantee the accuracy or reliability of any of the information, statements, or opinions expressed in the reports by the firms which have written them. We take due care to transcribe accurately what has been written by others but because of the possibility of human and mechanical error, we cannot assume any liability for the correctness of the transcription."

The *Transcript* also prints some management speeches, miscellaneous personnel announcements, and editorials. Its masthead lists only the names of Richard A. Holman, publisher and editor, and Mrs. L. J. Newman, managing editor. It also discloses that the publication has a second-class postage permit.

3. Advertisements to sell the *Transcript* have appeared in such publications as the *Wall Street Journal, New York Times*, and *Barron's*. The text typically offers such statements as "buy-sell-hold-switch recommendations," followed by an index of the companies whose securities have been discussed in the *Transcript*.

4. Books, papers and documents subpoenaed were:

"All of the following relating to the business of Wall Street Transcript Corporation during the period from January 1, 1967, until the present: (1) Copies of all advertisements, notices, circulars, newspaper articles and any other writings used in connection with the sale of the Wall Street Transcript. (2) All correspondence with subscribers and prospective subscribers of the Wall Street Transcript. (3) All documents, agreements, memoranda, correspondence and any other writings relating or containing reference to the obtaining of re-ports, comments, management speeches and any other written materials for publication in the Wall Street Transcript."

5. § 202(a) (11), 15 U.S.C. § 80b–2(a) (11), provides:

" 'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include (A) a bank, or any holding company affiliate, as defined in section 221(a) (c) of Title 12, which is not an investment company; (B) any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession; (C) any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor; (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation; (E) any person whose advice, analyses, or reports relate to no securities other than securities which are direct obligations of or obligations guaranteed as to principal or interest by the United States, or securities issued or guaranteed by corporations in which the United States has a direct or indirect interest which shall have been designated by the Secretary of the Treasury, pursuant to section 78c(a) (12) of this title, as exempted securities for the purposes of the Securities Exchange Act

fore need not register. It held that under the circumstances of this case the court, rather than the administrative agency, was the proper body to make the initial determination concerning the question of exclusion from coverage by the Act:

> "Where, as here, a publisher which presumptively is entitled to the protection of the First Amendment can make virtually an unrebutted showing that it is a bona fide newspaper and financial publication, a federal court should stay the hand of the investigating agency. An entirely different question would be presented if the SEC had complaints or other evidence of conduct by the publisher outside the normal functions of compiling and distributing an excluded publication." 294 F.Supp. at 307.

Since the district court's opinion also contained a reference to the "all-encompassing nature of the subpoena sought," the SEC asked for a "reargument or clarification" to determine whether a more limited subpoena or one with protective provisions might be enforced. The court concluded that these arguments were "clearly answered" by its original opinion, which had interpreted the Act to mandate exclusion of the *Transcript* from coverage or even investigation in the absence of some evidence of non-newspaper-like conduct.

 As the court below recognized, it has long been established that the question of the inclusion of a particular person or entity within the coverage of a regulatory statute is generally for initial determination by an agency, subject to review on direct appeal, rather than for a district court whose jurisdiction is invoked to enforce an administrative subpoena. So long as an agency establishes that an investigation "will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within [its] possession, and that

the administrative steps required * * * have been followed," no showing of probable cause need be made to the district court unless a statute indicates otherwise. United States v. Powell, 379 U.S. 48, 57–58, 85 S.Ct. 248, 255, 13 L.Ed. 2d 112 (1964); FTC v. Crafts, 355 U.S. 9, 78 S.Ct. 33, 2 L.Ed.2d 23 (1957); Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531 (1946); Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943); 1 Davis, Administrative Law, § 3.12 (1958). If these criteria are satisfied, the court will order enforcement unless there is danger that its process may be abused. United States v. Powell, 379 U.S. at 58, 85 S.Ct. 248.

Despite the absence of a finding that the subpoena was deficient in any of these respects, the district court felt that unique facts distinguish the instant case from this "substantial" line of precedents concerning initial determination of coverage by an agency. These circumstances were held to include not only the "virtually unrebutted showing" that the appellee qualified for a statutory exclusion, but also the fact that First Amendment considerations required a prompt court ruling upon coverage:

> "In the case at bar, I reason that the Commission's broad inquiry under the Act can end only in restraint of expression by the Wall Street Transcript. If a newspaper operates under the threat of disclosure to a government agency of its news sources and subscribers' identities, for example, it will be cautious, to say the least, about what it prints. Its 'caution' will only increase when its advertisers become apprehensive and its subscribers become intimidated by government scrutiny. This is classic restraint of expression which needs no further elaboration here. Plainly, neither the First Amendment nor the powers conferred by Congress in the Act upon the

of 1934; or (F) such other persons not within the intent of this paragraph, as

the Commission may designate by rules and regulations or order."

SEC permit an inquiry which can only lead to such a restraint of expression by a newspaper." 294 F.Supp. at 304.

Detecting "the seeds of a constitutional controversy" in "the Commission's possible intention to apply the Act to what appears to be a bona fide newspaper," the court interpreted the statute to permit it to bar an investigation which it felt "goes to the jugular of the Transcript as a publishing firm." The Commission disputes this admittedly unprecedented interpretation and argues that the determination of "bona fide newspaper" status by the court was both premature and incorrect. The appellee argues, on the other hand, that not only the statute but the First Amendment as well bars enforcement of the subpoena.

As the Supreme Court has stated, "The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). The Act's general objective, as summarized by the Senate Report upon the bill amending it in 1960, is "to protect the public and investors against malpractices by persons paid for advising others about securities." 1960 U.S.Code, Cong. & Admin.News p. 3503. It "reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser— consciously or unconsciously—to render advice which was not disinterested." SEC v. Capital Gains Research Bureau, *supra*, at 191–192, 84 S.Ct. at 282. (Footnote omitted.)

The core of the Act is its registration provision, § 203, which renders it unlawful for a non-registered investment adviser to make use of the mails or any instrumentality of interstate commerce in connection with his business. In addition, substantive provisions contained in §§ 205, 206 and 207 of the Act are designed to eliminate several specific practices labelled as abuses found to have existed at the time of the law's enactment. See, e. g., SEC v. Capital Gains Research Bureau, Inc., *supra*; Marketlines, Inc. v. SEC, 384 F.2d 264 (2 Cir. 1967); see also Loomis, The Securities Exchange Act of 1934 and the Investment Advisers Act of 1940, 28 Geo. Wash.L.Rev. 214, 244–245 (1959); 1960 U.S.Code, Cong. & Admin.News p. 3503.

The definition of "investment adviser" given in the Act, § 202(a) (11), 15 U.S.C. § 80b–2(a) (11), is broad and comprehensive but is followed by a series of exclusions, (A) through (F), of which (D) is "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." [6] In the absence of any legislative history which would shed light upon congressional intent in adding this newspaper exclusion or which might affect the scope of the definition, itself,[7] the court below concluded that this exclusionary clause was simply a recognition "that Congress was aware that it could not lawfully command or authorize regulation and licensing by the SEC of bona fide newspapers in the light of the teaching of the First Amendment." 294 F.Supp. at 307. Thus the district court and the parties before us have interpreted the adjective "bona fide" to mean that the SEC may investigate only such newspapers as are engaged in the activities of an investment adviser and which do not have "all the usual indicia of a newspaper as that term is generally understood by the public and

---

6. See note 5, *supra*. In addition to the definitional exclusions contained in § 202 (a) (11), 15 U.S.C. § 80b–2(a) (11), § 203(b), 15 U.S.C. § 80b–3(b), of the Act exempts certain investment advisers from registration but these do not relate to the present case.

7. See 86 Cong.Rec. 9807–9817, 10077 (1940).

is normally used to indicate an entity protected by the free press clause of the First Amendment." 294 F.Supp. at 306. The case has been presented as if the sole determinative issue were the number of "the usual indicia of a newspaper" the *Transcript* possesses, and the district court based its holding largely upon the size of the bundle of such characteristics.[8]

■ We do not think, however, that this is what Congress had in mind when it placed "bona fide" newspapers among the exclusions from the statute's coverage. Section 202(a) (11) of the Act lists a number of examples of persons or entities whose activities might fall within the broad definition of "investment adviser" but whose customary practices would not place them in the special, otherwise unregulated, fiduciary role for which the law established standards. Cf. SEC v. Capital Gains Research Bureau, Inc., *supra*. The phrase "bona fide" newspapers, in the context of this list, means those publications which do not deviate from customary newspaper activities to such an extent that there is a likelihood that the wrongdoing which the Act was designed to prevent has occurred.[9] The determination of whether or not a given publication fits within this exclusion must depend upon the nature of its practices rather than upon the purely formal "indicia of a newspaper" which it exhibits on its face and in the size and nature of its subscription list.[10]

■ It seems to us that the *Transcript* does not necessarily fit within this ex-

8. In addition to the information appearing from an examination of a copy of its publication, see note 2, *supra*, the appellee disclosed in affidavits to the district court that the *Transcript* began publication in June, 1963, and now has some 8,000 subscribers. The district court, which decided the case on the basis of affidavits only, found these subscribers to include "universities, libraries, corporations, individuals, trust companies, accounting firms, mutual funds, brokers, insurance companies and government agencies." 294 F.Supp. at 305.

While at one point in its opinion the trial court denominates the *Wall Street Transcript* a "bona fide 'financial publication of general and regular circulation'" (294 F.Supp. at 306), this is in the context of a discussion in which the court refers to the *Transcript* as a "bona fide newspaper or financial publication of general and regular circulation"—treating the publication as if it could be properly described as either or both of those two exclusions under the statute. The bulk of what the trial court had to say concerned its finding that the *Transcript* had nearly all the characteristics of a newspaper. In its recapitulation (p. 307) it concluded that the publisher could make "virtually an unrebutted showing that it is a bona fide newspaper and financial publication * * *" In view of the emphasis placed upon the trial court's inclusion in its finding of "a bona fide financial publication of general and regular circulation" by our learned brother in his concurring opinion, it should be borne

in mind that the discussion and holding by the majority is intended to apply to the statutory exclusion of a financial publication as well as to the newspaper exclusion.

9. It nowhere appears that the exclusion in question was made part of the Act because Congress thought it necessary to exempt all "usual" newspapers in order to comply with the First Amendment. It appears rather that those newspapers referred to as "bona fide" were considered to be those outside the regulatory intent of the Act. For example, the "bona fide newspaper" exclusion is part of a list which concludes with "such other persons not within the intent of this paragraph, as the Commission may designate * * *" See note 5, *supra*.

10. The appellee, assuming that the Act is not applicable to a newspaper which offers advice about specific investment opportunities in a regular feature, such as an individual column on a financial page, suggests that its own activities are no more than the same practice on a larger scale. While we express no opinion concerning the practices of other publications, differences in the manner or extent to which a publication offers investment information may very well be relevant to the Act's regulatory purpose. Cf. In re Darvas, 29 Misc.2d 777, 210 N.Y.S.2d 332 (Sup.Ct.N.Y.Co.1960) ; aff'd 13 A.D.2d 75, 213 N.Y.S.2d 108 (1st Dept.) ; rev'd 10 N.Y.2d 108, 217 N.Y.S.2d 603, 176 N.E.2d 402 ; cert. denied 368 U.S. 947, 82 S.Ct. 389, 7 L.Ed.2d 344 (1961).

clusion. Most of its published material consists of reprinted reports assessing various securities issues. The exhibits furnished to the court all devote nearly one-half of the front page and part of the second to an index to the contents which lists various companies by name. Each issue contains a similar cumulative index covering some extended period of time. This characteristic emphasis on particular issues and companies at the very least raises doubt about whether the *Transcript* is outside the exclusion—a suspicion which we believe that the S.E.C. should be allowed to investigate.

■ The parties implicitly recognized the importance of discussing the publication's practices in the "indicia" which they stressed during oral argument as the attempt to define the "usual" newspaper grew more elaborate: for example,[11] that the *Transcript* is not paid for its circulation of material by the brokerage houses whose reports it publishes, and that it determines the location of various articles in a particular issue upon the basis of its editor's news judgment alone. The truth of this assertion would be highly relevant to a determination of whether or not a publisher expects to induce readers to act directly upon certain investment advice; but whether or not it is so cannot be ascertained from a copy of the publication itself. It is immaterial to the principal issue in this case whether or not the "usual newspaper" is paid for using the news items which it publishes, if they are not offered as investment advice. What matters is whether or not a specific publication is engaged in practices which the Act was intended to regulate, such as the offering of professional investment advice without revealing the possibility of personal gain to the publisher from what he reports or how he presents it. See SEC v. Capital Gains Research Bureau, Inc., *supra.*

■ Nor can it be determined from its face that the *Transcript* is a "bona fide newspaper" within the meaning of this Act simply because, as the appellee suggests, it publishes financial "information." Any investment adviser, including one engaged in the most nefarious of practices, offers "information" to his clients; and any such adviser might choose to present it in the guise of traditional newspaper format. The type of printing and paper used, the employment of a certain number of reporters, the hiring of wire services, and the fact that "information" is offered and circulated generally would not necessarily reveal anything about the commercial practices involved or the financial interests served in its publication. It would be totally inconsistent with the purpose of the Act to hold that the exclusion would permit an unscrupulous operator to forestall investigation by arguing at a subpoena enforcement proceeding that his publication had enough of the trappings of a newspaper to prevent any inquiry into the practices involved in its publication and sale to investors. The Act's exclusion of a "bona fide newspaper" does not require a definitive description of a "typical newspaper." [12]

■ Moreover, it is not necessary to enlarge the category of "bona fide" newspapers into an exclusion for all publications which could conceivably be brought within the term "typical newspaper" in order to avoid the "seeds of a

---

11. In oral argument before this court, the appellee answered Commission challenges by stating for the first time that "the Transcript has reporters, including Mr. Holman who works full time," and that it "utilizes two wire services." It also represented that the *Transcript* does not receive any compensation for reporting and printing any matter or for positioning it in a particular place in the publication itself.

12. In addition, contrary to appellee's assertions, the interpretation of an exclusion in the Investment Advisers Act is not controlled by definitions of "newspaper" formulated as part of the construction of a different statute with a separate purpose. See, e. g., United States v. Arnold, 380 F.2d 366 (4 Cir. 1967); United States v. Kelly, 328 F.2d 227 (6 Cir. 1964); United States v. Azar, 243 F. Supp. 345 (E.D.Mich.1964).

constitutional controversy" which the appellee argues would result from an attempt to regulate the conduct of any newspaper publisher. As Justice Harlan pointed out in Curtis Publishing Co. v. Butts, 388 U.S. 130, 150, 87 S.Ct. 1975, 1989, 18 L.Ed.2d 1094 (1967):

"A business 'is not immune from regulation because it is an agency of the press. The publisher of a newspaper has no special immunity from the application of general laws * * *' Federal securities regulation, mail fraud statutes, and common-law actions for deceit and misrepresentation are only some examples of our understanding that the right to communicate information of public interest is not 'unconditional.'" (Citations and footnotes omitted.)

The Investment Advisers Act does not on its face abridge freedom of the press simply because it may be applied to publications which are classified formally as part of the "press" for some purposes but are not "bona fide newspapers" excluded under the Act. It is not necessary to base a construction of the Act on the assumption that the activities involved in giving commercial investment advice are entitled to the identical constitutional protection provided for certain forms of social, political or religious expression. As one court has put it:

"Promoting the sale of a product is not ordinarily associated with any of the interests the First Amendment seeks to protect. As a rule, it does not affect the political process, does not contribute to the exchange of ideas, does not provide information on matters of public importance, and is not * * * a form of individual self-expression. It is rather a form of merchandising subject to limitation for public purposes like other business practices."

Banzhaf v. FCC, 405 F.2d 1082, 1101–1102 (D.C.Cir.1968), cert. denied sub nom. Tobacco Institute, Inc. v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). See New York State Broadcasters Ass'n, Inc. v. United States, 414 F.2d 990, 998 (2 Cir. 1969); Halsted v. SEC, 86 U.S.App.D.C. 352, 182 F.2d 660, 668–669 (1950); Note, Freedom of Expression in a Commercial Context, 78 Harv.L.Rev. 1191 (1965); cf. SEC v. May, 229 F.2d 123, 55 A.L.R.2d 1123 (2 Cir. 1956).

Determining whether a specific newspaper is "bona fide" for the purposes of the Act requires the delineation of a boundary between the special type of "merchandising" activities which must lead to registration and the publication of expression which lies beyond the Act's regulatory purposes. Since the *Transcript's* practices have not yet been explored, neither this court nor the district court is presently in an appropriate position to attempt to draw such a line. But the distinction required by the words "bona fide" in the Act, when made, will be based on a study of the context in which the activity or expression in question occurs. The process by which a proper categorization is reached will therefore parallel the investigation appropriate to a determination of whether a particular activity is a restricted practice or a form of expression protected by the First Amendment. See, e. g., United States v. O'Brien, 391 U.S. 367, 376–382, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); Mills v. Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964); Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); see generally Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877 (1963); cf. Note, Symbolic Conduct, 68 Colum.L.Rev. 1091 (1968). Thus no constitutional conflict is inherent in the fact that an investment

advisory "newspaper" which is not "bona fide" might be required to register.[13]

The district court incorrectly concluded that the Act mandates its determination that the *Transcript* is excluded from coverage. This result cannot be supported upon the grounds cited, that the *Transcript* on its face offers "virtually an unrebutted showing that it is a bona fide newspaper and financial publication" and that the First Amendment would not permit any other conclusion. Although the Commission has not suggested that it now possesses evidence that the *Transcript* is engaged in practices which would ultimately deny it the benefit of the "bona fide newspaper" exclusion, the publication's right to this exclusion under the Act cannot be called self-evident upon the basis of a "virtually unrebutted showing" which reveals little about the presence or absence of such practices.

■ It therefore follows that the principles established in Oklahoma Press Pub. Co. v. Walling, *supra*, are controlling in this case. The Commission is particularly familiar with the many guises which practices in the securities markets may assume, and it is best suited to make the determination of "bona fide" newspaper status in the first instance. At this stage the district court should not embark upon such a wide scope of inquiry as may be needed for that purpose. There is no reason to believe that the Commission will not be fully aware of the importance of First Amendment considerations when it interprets and applies the Act's exclusion.

The appellee suggests, however, that the *Oklahoma Press* principles should be modified because, assuming it is in fact a "bona fide" newspaper, the investigation contemplated would chill its exercise of constitutionally protected rights of expression while in progress. For this reason, it urges, a court should itself determine coverage. The court below agreed in effect, citing the particularly chilling effects of investigations which inquire about news sources and subscribers. The appellee contends that such a probe, which might seek some of its most confidential operating information, would both deter its own editorial criticism of the Commission[14] and intimidate its subscribers and sources of information.

■ Nevertheless, we do not conclude than any investigation of a "bona fide" newspaper by the Commission pursuant to the Act would so circumscribe its expression during the interim that a court must make the initial determination of coverage. While the chilling effect doctrine may in some cases be applied to affect principles of judicial review of the administration of a federal statute, see Wolff v. Selective Service Local Board 16, 372 F.2d 817 (2 Cir. 1967); Note, The Chilling Effect in Constitutional Law, 69 Colum.L.Rev. 808, 830–832 (1969), the fact that a demand for disclosure may have some deterrent effect upon speech does not automatically invalidate it. See Communist Party of

13. A conflict is not introduced simply by designating the Act a form of "licensing statute," without regard to the nature of the activities or expression involved, as the appellee argues. If a publication is "bona fide" under the Act and within the First Amendment's protection of expression, it will not be subject to regulation or "licensing." And even if a newspaper is engaging in commercial practices which may be regulated, the Act grants no authority for review or censorship by the Commission of investment advisory material prior to its publication. Cf. Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

14. While the appellee contends that the "only permissible inference is that this investigation is designed by the SEC to throttle the criticism leveled against it by the *Transcript*" and thus "to destroy an old opponent," it appears that no significant editorial criticism of Commission activities, if any, was printed prior to the beginning of the present investigation. Indeed, the Commission alleges that the *Transcript* contained no editorials whatsoever during the first two years of its existence, 1963–1965.

United States v. Subversive Activities Control Bd., 367 U.S. 1, 91, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); Barenblatt v. United States, 360 U.S. 109, 125–134, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). See also W. E. B. DuBois Clubs of America v. Clark, 389 U.S 309, 313, 88 S.Ct. 450, 19 L.Ed.2d 546 (1967).

It has not been shown that the production contemplated by this subpoena would restrict the *Transcript's* expression more than the administrative investigation of a newspaper approved as consistent with the First Amendment in *Oklahoma Press, supra,* 327 U.S. at 192–193, 66 S.Ct. 494.

In the first place, the subpoena does not "go to the jugular of the *Transcript* as a publishing firm" merely because it asks for the production of certain correspondence and advertising materials which appear to be directly related to an investigation of the type of practices which might cause a newspaper to fall outside the Act's exclusion. No dragnet is cast for lists of all subscribers; instead, the information sought is much like that subpoenaed in *Oklahoma Press* itself.[15]

Contrast NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

The alternative method by which the Commission might have attempted to investigate the commercial activities of the *Transcript* would have been more likely to threaten a chilling of free expression than would compliance with the subpoena in question. The Commission might have addressed separate queries to all the securities industry institutions which supply the material the *Transcript* publishes, or to the investment community members likely to be among its more prominent subscribers. Such a probe could have generated rumors which might have been much more difficult to counteract, and much more damaging, than the private investigation in question.[16] Cf. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

If the production of materials sought by the Commission's subpoena in this case does threaten any unusual disruption of the *Transcript's* normal operations, the appellee is, of course, free to ask the district court for appropriate protective limitations. See *Oklahoma Press, supra.*

Reversed and remanded.

DANAHER, Senior Circuit Judge (concurring in remand):

In this case, presenting an issue of first impression, the parties have dealt inadequately with what I think is a basic aspect. Most importantly under the circumstances presented, I feel we are bound to take account of the Congressional declaration that certain entities and individuals have *not* been included as investment advisers as defined in

---

15. The subpoena enforced in *Oklahoma Press* required production, *inter alia,* of " \* \* \* all your books, papers and documents showing the distribution of papers outside the State of Oklahoma, the dissemination of news outside the State of Oklahoma, the source and receipt of news from outside the State of Oklahoma, and the source and receipt of advertisements of nationally advertised goods." 327 U.S. at 210 n. 46, 66 S.Ct. at 506.

The subpoena in the present case does not differ in its effect from that in *Oklahoma Press* because enforcement, like the Act's regulation, is "pursuant to a licensing statute," see n. 13, *supra.* The appellee concedes that it would be entirely proper for the Commission to investigate the commercial practices of any type of newspaper in connection with specific activities thought to violate anti-fraud provisions of the Securities Act of 1933 or the Securities Exchange Act of 1934. There could be no substantial difference between the effect of such an investigation and enforcement of a subpoena under the Investment Advisers Act, even though the ultimate sanctions under the statutes are not the same.

16. The Commission's order authorized a private investigation, and § 210(b) of the Act provides that its staff cannot disclose any information obtained in such an investigation without further Commission authorization.

section 202(11) of the Investment Advisers Act.

Senate Report 1775 from the Committee[1] on Banking and Currency will be found in full commencing at page 10071, Congressional Record, Volume 86, Part 9, 76th Congress, 3d Session. As the Report shows, after extensive hearings at which much opposition had been voiced, the subcommittee recessed while the Commission,[2] spokesmen for various interests, and the Committee staff conferred and worked out the terms of the bill.[3] Compromise and agreement having been reached, both branches of Congress then unanimously passed H.R. 10065, a bill identical to S. 4108.

So it was that Senate Report 1775 analyzing the provisions of the pending legislation set forth at Congressional Record page 10077:

"Findings and definitions: Section 201 and 202 contain, respectively, the findings of the Congress with respect to investment advisers and the definitions of various terms used in title II. *The term 'investment adviser' is so defined as specifically to exclude banks, bank holding-company affiliates, lawyers, accountants, engineers, teachers, brokers* (insofar as their advice is merely incidental to brokerage transactions for which they receive only brokerage commissions), *publishers of bona fide newspapers, news magazines, or financial publications of general and regular circulation,* and persons whose advice is limited to securities issued by the United States and certain instrumentalities of the United States. In addition the *Commission is authorized* by rules and regulations or order *to make certain further exceptions according to prescribed* statutory standards." (Emphasis added.)[4]

Seldom will we find more knowledgeable participants, notes 1 and 2, *supra*, than those who evolved this legislation. Clearly their wording was meaningful, but it seems to me my colleague is saying that when Congress adopted the exclusionary language, it was the same as leaving it out of the Act. Observing that the case was "close," the District Judge seems to have sought to steer a course between the position of the Transcript that the Commission had no jurisdiction[5] whatever to undertake the investigation, and the Commission's insistence that it, and it alone, possessed the power of decision.

## I

The Commission's July 27, 1967 order directing an investigation recited that

---

1. That Committee included Chairman Wagner, Senator Carter Glass (a noted publisher and financial expert), Senator James F. Byrnes (later Supreme Court Justice and Secretary of State), Senator Francis Maloney, Senator Robert A. Taft and others of wide experience in the business and financial world.

2. The Commission functioned under its Chairman, the late Jerome Frank, thereafter a valued member of this Court, and other noted members such as Leon Henderson and Sumner S. Pike. After protracted conferences had resolved opposition, the major interested parties joined in a statement *urging passage* of the legislation. Cong.Record, *ubi supra*, p. 10077.

3. Mr. Justice Goldberg in S. E. C. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) drew upon Senate Report 1775 in outlining the background for the Court's consideration of the question presented in that case which had been heard *en banc* in this Court. 306 F.2d 606 (1962). The Supreme Court decided that a registered investment adviser, being a person "who, for compensation, engages in the business of advising others" (375 U.S. 187, n. 15, 84 S.Ct. at 280) charged with "scalping" could be required to make full disclosure to his clients. The case did not deal with the question here presented. And see Marketlines, Inc. v. Securities and Exchange Commission, 384 F.2d 264 (2 Cir. 1967).

4. And see section 202(a) (11) of the Act.

5. But surely the publisher of a paper has no special immunity from laws applicable to business in general. Associated Press v. National Labor Relations Board, 301 U.S. 103, 130, 132–133, 57 S.Ct. 650, 81 L.Ed. 953 (1937).

the "Holman Co." had been expelled from membership in the NASD and that Richard A. Holman was a "cause" for that order. The Commission further recited that it had information tending to show that Holman is the publisher and editor of the Transcript, he controls the Transcript Corporation, the Corporation was making use of the mails in connection with the sale of the Transcript to the public and that, without having filed for registration with the Commission, the Transcript "is an investment advisory publication and the Corporation is therefore an investment adviser within the meaning of the term under the Investment Advisers Act of 1940." Thus the order directed that an investigation be conducted pursuant to §§ 209(a) and (b) of the Act to ascertain the possible existence of a violation of § 203 of the Act.

The subpoena *duces tecum* was directed to "Wall Street Transcript Corporation by Richard A. Holman" calling for testimony "In the Matter of Wall Street Transcript Corporation and Richard A. Holman."[6] The subpoena sought the production, not merely of "certain correspondence and advertising materials," but

> "*All of the following* relating to the business of Wall Street Transcript Corporation during the period from January 1, 1967 until the present:
>
> 1) Copies of *all* advertisements, notices, circulars, newspaper articles and any other writings used in connection with the sale of The Wall Street Transcript.
>
> 2) *All correspondence* with subscribers and prospective subscribers to The Wall Street Transcript.

> 3) *All* documents, agreements, memoranda, correspondence and *any other writings* relating or containing reference to the obtaining of reports, comments, management speeches and any other written materials for publication in The Wall Street Transcript." (Emphasis added.)

The District Judge recognized the "all-encompassing nature of the subpoena sought." Undoubtedly his perception in this respect entered into his denial of the motion for enforcement. Rather than an outright refusal to lend the aid of the Court to the Commission's demand, under the circumstances of this case I think he should have called for a showing as to the particular factors upon which the Commission's administrative judgment would turn.[7] In the failure to do so, as it seems to me, lay error. Section 209(c) provides that "the Commission may invoke the aid" of the Court and that the Court "may issue an order."[8] Thereafter, not the demand of the subpoena but the terms of the Court's order, if warranted, would have controlled the course of the investigation. Unless it could be made to appear that the Transcript was *not* the publisher of a "bona fide newspaper" or of a bona fide "news magazine," or of a bona fide "business or financial publication of general and regular circulation," the court was free to withhold an enforcement order.

## II

Of course, as our able colleague points out, in the ordinary case of an investigation conducted by an administrative agency, no showing of probable cause need be made to the District Court unless a statute indicates otherwise.[9] But this

---

6. Neither in the Court below nor at argument nor on brief here has it been suggested that the Commission sought an investigation of Holman.

7. In view of the scope of the demands of the subpoena and as bearing upon what information might be deemed relevant, Commission counsel was questioned from the bench during the argument of this appeal. Counsel failed to specify the

factors upon which the Commission's administrative judgment might be exercised.

8. Shasta Minerals & Chemical Co. v. Securities & Exch. Com'n, 328 F.2d 285 (10 Cir. 1964).

9. Rejecting there the imposition of a "probable cause" standard, the Court in United States v. Powell, 379 U.S. 48, 56, 85 S.Ct. 248, 254, 13 L.Ed.2d 112

was not a proceeding under the Securities Act of 1933 or that of 1934. This situation arose under the Investment Advisers Act, and its terms must be regarded. Here Congress has interposed a series of limitations, and in specific language, *supra*. The Commission in effect would have us say that its powers are unlimited. The Supreme Court speaking through Mr. Justice White in See v. City of Seattle, 387 U.S. 541, 544, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967), has distilled from its earlier cases the rules to be stated thus:

> It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena *be sufficiently limited in scope, relevant in purpose,* and *specific in directive* so that compliance will not be unreasonably burdensome.[5] (Footnote omitted.) The agency has the right to conduct all reasonable inspections of such documents which are contemplated by statute, but *it must delimit the confines of a search by designating the needed documents in a formal subpoena.* In addition, while the demand to inspect may be issued by the agency, in the form of an administrative subpoena, it may not be made and enforced by the inspector in the field, and the subpoenaed party may obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply. (Emphasis supplied.)

The findings of the District Judge are spelled out in Securities & Exch. Com'n v. Wall Street Transcript Corp., 294 F.Supp. 298 (1968) at pages 304–306. The evidence upon which he relied and the transcript of argument before him are part of our record, and fully support his ultimate conclusion:

> Upon the available evidence, the Transcript appears to be *a bona fide "financial publication of general and regular circulation." Ibid.* 306.[10] (Emphasis mine.)

I agree. That conclusion is specific, directly follows the statute and involves no "newspaper" discussion.

### III

So, as Mr. Justice White pointed out in the See case, *supra*, the agency "must delimit the confines of a search by designating the needed documents in a formal subpoena." That instrument, to avoid abuse of the court's process, must be "sufficiently limited in scope, relevant in purpose, and specific in directive." (And see 294 F.Supp. at 307.)

Moreover the subpoenaed party "may obtain judicial review of the reasonable-

---

(1964), protected its holding thus: "*Without some solid indication* in the legislative history that such a gloss was intended, we find it unacceptable." (Emphasis added.) Here we have that "solid indication."

Again, in Okla. Press Pub. Co. v. Walling, 327 U.S. 186, 215–216, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531 (1946), the Court found the "showing" sufficient, noting that the Congress had made no requirement of *any* showing of probable cause. No "standards for administrative action which the judiciary first had to weigh and appraise" had been set by Congress, as Justice Douglas noted, dissenting in United States v. Powell, *supra*, 379 U.S. at 59, 85 S.Ct. at 256, citing United States v. Morton Salt Co., 338 U.S. 632 at 654, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

Here by its exclusionary language, *supra*, Congress clearly differentiated each of several classes from those who otherwise would come within the definition of "investment adviser." I suggest that the limiting language clearly demonstrates the need for such a showing as will justify the conclusion that the entity is no longer entitled to the exclusion, e. g., that the "performance of such services" by a lawyer is not "solely incidental to the practice of his profession." Or that the broker has indeed received "special compensation," for "such services."

10. That conclusion is sufficient for our purposes, especially since we need not, indeed should not, reach a First Amendment issue where adequate ground otherwise exists for disposition of the case. Judge Tyler had further observed that the Transcript has all the usual indicia of a newspaper, noting also that the SEC had furnished no persuasive evidence to the contrary.

ness of the demand prior to suffering penalties for refusing to comply."

Accordingly, in the circumstances of this case and for the reasons I have adduced, I would remand for a hearing. The District Judge should require that the Commission satisfy him as to what are the "needed documents," relevant to what purpose, and how specifically they may be pertinent to support the claim in the Commission's original order and application for the Court's aid. That order predicated the Commission's investigation on the claim that the Transcript "is an investment advisory publication" and that it is "an investment adviser" within the meaning of the Act. The Commission must have had some factors in mind upon which to base its allegation and its conclusion, however tentative. Let the Court become satisfied that its aid is required, that its order may be tailored to the *need* to be *demonstrated.*

For the Court to yield otherwise is to ensconce "administrative absolutism" at its unreachable zenith. I cannot believe that Congress intended any such result, and thus I respectfully differ from my colleagues.

